CASE NO. 15-10590

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

UNITED STATES OF AMERICA

*Plaintiff-Appellee,*

v.

SHAUN W. BRIDGES

*Defendant-Appellant.*

————————————

## DEFENDANT-APPELLANT'S EXCERPTS OF RECORD
## VOLUME 1, PAGES 1-126

————————————

Appeal From a Judgment of the
United States District Court for the Northern District of California
Case No. 3:15-cr-00319-RS The Honorable Richard Seeborg,
United States District Judge

————————————

HANSON BRIDGETT LLP
Davina Pujari, SBN 183407
Emily M. Charley, SBN 238542
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:   (415) 777-3200
Facsimile:   (415) 541-9366

Attorneys for Defendant-Appellant
Shaun W. Bridges

12574579.1

# UNITED STATES OF AMERICA V. SHAUN W. BRIDGES

## Appeal No. 15-10590

## <u>Volume 1</u>

JUDGMENT, December 7, 2015 (Dkt #97).......................................................... 1

TRANSCRIPT, December 7, 2015 Sentencing Hearing (Dkt #109) ..................... 7

TRANSCRIPT, August 31, 2015 Plea Hearing (Dkt #132) .................................. 87

12574579.1

AO 245B (Rev. AO 09/11-CAN 7/14) Judgment in Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
## Northern District of California

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| Shaun W. Bridges | ) USDC Case Number:  CR-15-00319-001 RS |
| a/k/a "Number 13" | ) BOP Case Number:  DCAN315CR00319-001 |
| | ) USM Number:  20436-111 |
| | ) Defendant's Attorney:  Steven Hale Levin and Craig Denney |
| | (Retained) |

**THE DEFENDANT:**

☑ pleaded guilty to count(s): One and Two of the Information

☐ pleaded nolo contendere to count(s):  which was accepted by the court.

☐ was found guilty on count(s):  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1957 | Money Laundering | March 30, 2015 | One |
| 18 U.S.C. § 1512 | Obstruction of Justice | March 30, 2015 | Two |
| | | | |

The defendant is sentenced as provided in pages 2 through _6_ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s):

☐ Count(s)  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/7/2015
Date of Imposition of Judgment

Signature of Judge
The Honorable Richard Seeborg
United States District Judge
Name & Title of Judge

12-7-15
Date

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

| DEFENDANT: Shaun W. Bridges | Judgment - Page 2 of 6 |
|---|---|
| CASE NUMBER: CR-15-00319-001 RS | |

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:
71 months. This term consists of 71 months on each of Counts One and Term, to be served concurrently.

☑ The Court makes the following recommendations to the Bureau of Prisons:
The defendant be designated to FCI Cumberland

☐ The defendant is remanded to the custody of the United States Marshal. The appearance bond is hereby exonerated.

☑ The defendant shall surrender to the United States Marshal in the District of Maryland

    ☑ on 1/29/2016 (no later than 2:00 pm).

    ☐ as notified by the United States Marshal.

The appearance bond shall be deemed exonerated upon the surrender of the defendant.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ at on (no later than 2:00 pm).

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

The appearance bond shall be deemed exonerated upon the surrender of the defendant.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at
_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

page 2

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

DEFENDANT: Shaun W. Bridges                                                    Judgment - Page 3 of 6
CASE NUMBER: CR-15-00319-001 RS

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of: <u>3 years.</u> This term consists of terms of 3 years on each of Counts One and Two, to be served concurrently.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☑   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check, if applicable.)*

☑   The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐   The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐   The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

   If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

   The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   The defendant shall not leave the judicial district without the permission of the court or probation officer;
2)   The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3)   The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4)   The defendant shall support his or her dependents and meet other family responsibilities;
5)   The defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6)   The defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7)   The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8)   The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9)   The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10)  The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11)  The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12)  The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13)  As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

DEFENDANT: Shaun W. Bridges

CASE NUMBER: CR-15-00319-001 RS

Judgment – Page 4 of 6

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall participate in a program of testing and treatment for alcohol abuse, as directed by the probation officer, until such time as the defendant is released from treatment by the probation officer. The defendant is to pay part or all of the cost of this treatment, at an amount not to exceed the cost of treatment, as deemed appropriate by the probation officer. Payments shall never exceed the total cost of urinalysis and counseling. The actual co-payment schedule shall be determined by the probation officer.

2. The defendant shall abstain from the use of all alcoholic beverages.

3. The defendant shall pay any special assessment that is imposed by this judgment and that remains unpaid at the commencement of the term of supervised release.

4. The defendant shall provide the probation officer with access to any financial information, including tax returns, and shall authorize the probation officer to conduct credit checks and obtain copies of income tax returns.

5. The defendant shall submit his person, residence, office, vehicle, or any property under his control to a search. Such a search shall be conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to such a search may be grounds for revocation; the defendant shall warn any residents that the premises may be subject to searches.

6. The defendant shall not have contact with any codefendant in this case, namely Carl Mark Force IV.

7. The defendant shall not own or possess any firearms, ammunition, destructive devices, or other dangerous weapons.

8. The defendant shall cooperate in the collection of DNA as directed by the probation officer.

Case 3:15-cr-00319-RS  Document 97  Filed 12/07/15  Page 5 of 6

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT: Shaun W. Bridges | Judgment - Page 5 of 6 |
| CASE NUMBER: CR-15-00319-001 RS | |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $200 | Waived | N/A |

☐   The determination of restitution is deferred until . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $  0.00 | $  0.00 | |

☐   Restitution amount ordered pursuant to plea agreement $

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐   the interest requirement is waived for the .

    ☐   the interest requirement is waived for the  is modified as follows:

---

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT:  Shaun W. Bridges | Judgment - Page 6 of 6 |
| CASE NUMBER:  CR-15-00319-001 RS | |

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows[*]:

**A** ☑ Lump sum payment of ____$200____ due immediately, balance due

    ☐ not later than  , or

    ☑ in accordance with   ☐ C,  ☐ D, or  ☐ E, and/or   ☑ F below); or

**B** ☐ Payment to begin immediately (may be combined with  ☐ C,   ☐ D, or  ☐ F below); or

**C** ☐ Payment in equal  (e.g., weekly, monthly, quarterly) installments of  _ over a period of  (e.g., months or years), to commence  (e.g., 30 or 60 days) after the date of this judgment;

**D** ☐ Payment in equal  (e.g., weekly, monthly, quarterly) installments of  _ over a period of  (e.g., months or years), to commence  (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within  (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:
    **When incarcerated, payment of criminal monetary penalties are due during imprisonment at the rate of not less than $25 per quarter and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program. Criminal monetary payments shall be made to the Clerk of U.S. District Court, 450 Golden Gate Ave., Box 36060, San Francisco, CA 94102.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States:
    a. $165,529.88 from Fidelity Brokerage account held in the name of Quantum Investments
    b. $306,000 held in a trust in attorney of record's name
    c. $4,745.92 from PNC Bank Account jointly held in the name of Shaun Bridges and a person known to the parties
    d. $651,000 Money Judgment

☐ The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future, **but such future orders do not affect the defendant's responsibility for the full amount of the restitution ordered.**

---

[*] Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 9 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 1 of 80

1

1                                                    Pages 1 - 79

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4    Before the Honorable Richard Seeborg, Judge.

5    UNITED STATES OF AMERICA,      )    APPEAL NO. 15-10590
                                    )
6          Plaintiff,               )
                                    )    CASE NO.
7    v.                             )    3:15-cr-00319-RS-1
                                    )
8    SHAUN W. BRIDGES,              )
                                    )
9          Defendant.               )
     _____)

10
                                        San Francisco, California
11                                      Monday, December 7, 2015
                                        11:00 A.M. Calendar
12

13                     TRANSCRIPT OF PROCEEDINGS

14   APPEARANCES:

15   For Plaintiff United States of America:

16             KATHRYN R. HAUN, AUSA
               450 Golden Gate Ave
17             PO Box 36055
               San Francisco, CA 94102
18
               RICHARD B EVANS, AUSA
19             DOJ
               Criminal Division, Public Integrity Section
20             1400 New York Ave NW, 12th Floor
               Washington, DC 20005
21
     For Defendant Shaun W. Bridges:
22
               CRAIG DENNEY, ESQ.
23             Snell and Wilmer
               50 W. Liberty Street, Suite 510
24             Reno, NV 89501

25   (APPEARANCES CONTINUED ON FOLLOWING PAGE:)

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 10 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 2 of 80

2

1    APPEARANCES (CONTINUED.)

2

3    For Defendant Shaun W. Bridges:

4         STEVEN HALE LEVIN, ESQ.
          Levin and Curlett LLC
5         201 N. Charles Street, Suite 2000
          Baltimore, MD 21201

6

7

8    Reported by Kelly Polvi, Contract Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 11 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 3 of 80

3

1    MONDAY, DECEMBER 7, 2015                    11:04 A.M.

2                    P R O C E E D I N G S

3                       ---000---

4        THE CLERK:  Calling case CR-15-319, United States versus

5    Shaun W. Bridges.

6        Counsel, please state your appearances.

7        MS. HAUN:  Good morning, Your Honor.  Kathryn Haun for

8    the United States.  I'm joined by my co-counsel, Richard Evans,

9    from the Department of Justice's Public Integrity Section.

10       MR. EVANS:  Good morning, Your Honor.

11       MR. LEVIN:  Good morning, Your Honor.  Steven Levin on

12   behalf of Mr. Bridges.

13       MR. DENNEY:  And Craig Denney on behalf of Mr. Bridges.

14       THE COURT:  Good morning.  This is the time set for

15   sentencing.

16       Has counsel had the opportunity to review the presentence

17   report?

18       MS. HAUN:  Yes, Your Honor.  I'd like to turn this

19   portion of the hearing to my colleague, Mr. Evans.

20       THE COURT:  Let me just get some preliminaries, and then

21   you can divvy it up however you would like to do it.

22       Have you had an opportunity to review the presentence

23   report?

24       MR. LEVIN:  Yes, Your Honor.

25       THE COURT:  And have you had an opportunity to discuss

```
1    that with your client, Mr. Bridges?
2         MR. LEVIN:  I have, Your Honor.
3         THE COURT:  All right.  Let me just make clear what I
4    have reviewed.  I've reviewed the presentence report; I've
5    reviewed the government's sentencing brief; I've reviewed the
6    defendant's sentencing brief, which attaches various
7    commendations received by Mr. Bridges during his law
8    enforcement career, as well as letters of support from former
9    Maryland Governor Ehrlich, Mr. Hutchins, who apparently is a
10   former superintendent of the Maryland state police, and
11   Mr. Lawman, a former Secret Service colleague of Mr. Bridges;
12   and then I've also reviewed the report that the defense has
13   submitted that was prepared by Dr. Bloomberg.
14        Okay.  Now, Ms. Haun, you wanted to tell me something?
15        MS. HAUN:  Your Honor, I just wanted to see how the Court
16   wanted to proceed today.  As the Court is aware, we have a
17   victim here who's flown out here to make a victim impact
18   statement.  That's Mr. Curtis Green.
19        So just wanted to kind of take the --
20        THE COURT:  Okay.  Well, I will -- we'll get there.  Let
21   me do a few things first, and then I'll tell you when would be
22   an appropriate time to hear from -- Mr. Curtis, you said?
23        MS. HAUN:  Mr. Curtis Green.  Mr. Green.
24        THE COURT:  Okay.
25        MS. HAUN:  And Mr. Evans is prepared to address a large
```

1    part of the arguments made in the government's sentencing

2    memorandum.  I also have a few points, Your Honor, to make

3    before the government submits the matter.

4         THE COURT:  That is fine.  And you can divide up your

5    discussion any way you want to divide it up.

6         MS. HAUN:  Thank you.

7         THE COURT:  Let me first focus on the presentence report.

8         Are there any factual objections beyond those that are

9    listed in the addendum to the report?

10        MR. EVANS:  Not from of the government, Your Honor.

11        MR. LEVIN:  No, Your Honor.

12        THE COURT:  Okay.  Let me just go through those.

13   Objections 1 through 4 pertain to various paragraphs in the

14   offense conduct section.  I've read the objections, I've read

15   the responses from the probation officer, and I'm satisfied

16   with the responses from the probation officer as to his bases

17   for including the information.

18        And I, therefore, will overrule those objections.

19        Objection No. 5 goes to the two-level upward adjustment

20   for sophisticated means to be 1.1(b)(10)(C).

21        Mr. Levin, I'll hear from you.  But I have to tell you, I

22   think it's fully warranted, and unless there's something in

23   addition you want to present, I think those two levels plainly

24   apply.

25        MR. LEVIN:  I think they do too, Your Honor, as a matter

1    of law, but -- and I don't want to waste the Court's time with

2    this.  But I do want to at least emphasize, which we've

3    addressed in the sentencing memo, the fact that, as a practical

4    matter -- perhaps not as a legal matter, but as a practical

5    matter -- this wasn't particularly sophisticated.

6         Mr. Bridges set up a Mt. Gox account in his name.  The

7    money was -- at the time Mr. Bridges set up that

8    Mt. Gox excha- -- account, there were ceiling limits put in

9    place so that the nine or so transactions that occurred in the

10   two months that followed from Mt. Gox to a fidelity account

11   were already set in place.  They were automatic.  So

12   Mr. Bridges engaged in the conduct.

13        At this point, however, this was passive conduct for

14   those two months.  And the money was transferred to another

15   account in Mr. Bridges's name, and then ultimately 200,000 --

16   or $250,000 was transferred to a bank account in his name and

17   that of his wife so that they could pay taxes.

18        That's really only -- the only point that I wanted to

19   make, that there weren't additional efforts to hide his

20   identity.

21        THE COURT:  I fear our definition of "sophisticated" is

22   quite different.  I think this is plainly sophisticated.  And

23   additionally, the two levels would apply because I do think

24   there's activities through the Japanese account.  Offshore, if

25   you will.  It's pretty clear to me that it's a -- to me, it's a

1   sophisticated scheme.

2          Okay.  Our starting point, as always, is the -- has to be

3   the advisory sentencing guidelines, which I find are correctly

4   calculated in the presentence report as a total offense level

5   of 25, a criminal history category of one, and that yields an

6   advisory guideline sentencing range of 57 to 71 months.

7          The government and the probation officer are recommending

8   a high-end sentence of 71 months; the defense is arguing for a

9   custodial sentence of not more than 36 months.

10         So that's where things stand.

11         Let me look to the government to begin the discussion.

12         MR. EVANS:  Thank you, Your Honor.

13         In addition to the guidelines calculation, I want to

14   point out the fact that, as indicated in the presentence

15   report -- which was not objected to by defense -- that there

16   is -- the probation office found that there is no basis for

17   departure in this case.

18         And we would agree with that, that there are no

19   identifiable grounds for departure.

20         And in defense's sentencing memo they've identified two,

21   pursuant to the sentencing guidelines.  Section 5(h)1.3,

22   regarding mental health, and 5(h)1.4, regarding alcohol abuse.

23   And I guess those are directed toward departures.

24         And as we've said, and as I think the presentencing

25   report points out, that there are no departures that are

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 16 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 8 of 80

8

1    appropriate here.  They're essentially asking for a downward

2    variance, which is something different.

3         And we -- and the government, Your Honor, contends that

4    there are no bases for a downward variance here either.

5         The thrust of defense's argument at this point is that

6    given the defendant's law enforcement career in -- whether it

7    was the county, then the State of Maryland and Secret

8    Service -- and the fact that he's a first offender, should

9    translate into a downward variance from the guideline range.

10        Your Honor, the government believes that neither of those

11   should merit any downward variance.  In fact, the first-time

12   offender role is taken into account by the guidelines, the fact

13   that he's category one instead of some other category.  To the

14   extent that that's even an issue.

15        So what we're left with, Your Honor, is the 3553(a)

16   factors to discuss in fashioning an appropriate sentence that's

17   appropriate in a case such as this.

18        And, Your Honor, I think that the Court -- and as we've

19   made plain in our sentencing memorandum -- has to focus on the

20   nature and circumstances of the offense here.

21        This was not just a pure theft.  This was not someone

22   stealing money from the till.  This was an agent, a federal law

23   enforcement agent, who was involved in a multi-agent --

24   multi-agency task force that had been ongoing for years who

25   decided to steal bitcoins, which he later converted to cash,

1    from essentially the target of the investigation, and lay the

2    blame for that theft on a cooperating witness.

3         This was not a mere theft, as defense counsel would like

4    this Court to believe.  And I know the defense pointed out

5    several cases which speak to that -- from courts outside of

6    this jurisdiction and outside the Ninth Circuit, which would

7    support the idea that, well, in theft -- for theft cases, the

8    guidelines are too high.

9         That's not the case in this particular situation,

10   Your Honor.  Although this was a theft, the crimes to which

11   defendant pled to were money laundering related to wire fraud

12   under 1957, and obstruction of justice under 1512.

13        So --

14   **THE COURT:**  The obstruction of justice charge, that is --

15   in part, goes to conduct once the law enforcement authorities

16   realized something was going on.

17        Just go over with me again.  I know I reviewed it in the

18   context of certainly the entry of the plea, but what is the

19   obstruction charge?  What's the essence of it?

20   **MR. EVANS:**  Your Honor, the Court is correct.  There are

21   basically two components of the obstruction conduct here.  The

22   one related to Mr. Bridges's obstruction of the Baltimore

23   investigation of trying to determine who Dread Pirate Roberts

24   was and obstructing that investigation by stealing the

25   bitcoins, by making that cooperator unavailable for future

1    cooperation.

2        Basically, they had to kill him off because of this

3    theft.  Which you'll hear more about that from the -- Mr. Green

4    himself.

5        So the obstruction of that investigation is one

6    component.

7        The obstruction on the second part is as to our

8    investigation of the criminal acts that were undertaken as part

9    of the task force related to Mr. Mark -- Carl -- Force -- which

10    he was sentenced back in October by this Court -- as well as by

11    Mr.  Bridges, where he lied to federal agents back in -- I

12    believe it was May of 2014; again, in November of 2014.

13    **THE COURT:**  The lie took the form, in Mr. Bridges's case,

14    of suggesting that Mr. Green was the one who actually had

15    stolen the bitcoin.

16    **MR. EVANS:**  Actually, that, Your Honor, was as to the

17    first component.  I think basically when the theft came -- when

18    the theft occurred, everyone focused on Mr. Green because it

19    was done with his own --

20    **THE COURT:**  His access.

21    **MR. EVANS:**  His access.  And no one on the task force

22    wanted to believe it was anyone else on the task force who had

23    done that, so they all focused on Mr. Green.  And, in fact,

24    they said, "You're trying to be a cooperator, yet you're

25    stealing bitcoins.  You're not even going to get the benefit of

1    that cooperation."

2         So that obstructive conduct related to the theft of the

3    bitcoins.

4         The other obstruction came as to this grand jury

5    operating out of San Francisco, who was investigating

6    corruption by the task force agents.  In fact, Mr. Bridges was

7    interviewed by agents in Baltimore -- I believe it was in May

8    of 2014.  Then in Washington, D.C., about six months later --

9    in November of 2014, was questioned about various aspects of

10   the Force conduct, as well as possibly his own, and lied to

11   federal agents during those interviews.

12        He also lied to federal agents subsequently, in March of

13   2015, just prior to pleading guilty regarding the -- his

14   interactions with another Secret Service employee who had done

15   FinCEN searches for him to figure out whether or not any SARS

16   had been issued with his name and as a result of the transfers

17   of funds to Fidelity, and basically met with her before and

18   after her testimony -- her interviews with agents, and her

19   testimony to the grand jury, about telling a false consistent

20   story.

21        So there was obstruction of the Baltimore grand jury

22   investigating the Silk Road, and obstruction of the

23   San Francisco grand jury investigation investigating the agents

24   who we believe were corrupt at the time.

25        THE COURT:  Well, my understanding is that while they

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 20 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 12 of 80

12

1    interact at a certain point, Mr. Force and Mr. Bridges are

2    engaged in, if you will, separate conduct in terms of the money

3    laundering and the theft activity.

4         MR. EVANS:  That appears to be the case, Your Honor.

5         THE COURT:  They're not doing that in conjunction or in

6    league with each other in any way.

7         MR. EVANS:  We've not revealed any evidence that would

8    indicate that.  You know, in a small task force, when you've

9    got corrupt agents, one would think they would possibly talk

10   about that.  But we've not recovered any evidence to suggest

11   that.  And all we've got at this point is indications that they

12   were operating in separate silos, doing it on their own.

13        THE COURT:  But then they do come together with respect

14   to Mr. Green and that whole business.

15        MR. EVANS:  They are, Your Honor.  They were both

16   involved in the arrest of Mr. Green and his debrief.

17        Now, Mr. Bridges left that next day and did not attend

18   the second day of the debrief, but that was after he had stolen

19   the bitcoins.  I think he probably wanted to get out of there

20   and didn't want to be a part of it.

21        But yes, Your Honor, as far as the government knows at

22   this point, the evidence is they were operating independently.

23        THE COURT:  Okay.

24        MR. EVANS:  Now, Your Honor, as we indicated in our

25   pleadings as well, that this was not a -- this was not a single

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 21 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 13 of 80

13

1  act.  There was a theft that happened in one instance, or over

2  a certain period of time when he withdrew bitcoins from various

3  accounts.  But that was not the only part of his crime here,

4  Your Honor.  He then had to transfer those funds

5  internationally to Japan, to Mt. Gox, and then, over time,

6  transfer those, convert those to funds, and transfer them back

7  into his Fidelity account.

8      **THE COURT:**  There is a suggestion he does pay taxes on

9  all that.

10      **MR. EVANS:**  He apparently did pay taxes on it.  I don't

11  know if he was trying to, you know, make it so it's legitimate,

12  that if anyone looked at that they'd say, "Oh, he made money in

13  investing in bitcoins."  He was known to be an investor and he

14  had invested in bitcoins on his own.  Maybe that was an attempt

15  to further legitimize this to say, "Hey, if someone looks at my

16  accounts they'll see I paid taxes on it."

17      But the defendant had an opportunity many times along the

18  way to come in and to come clean and he didn't.  When he was

19  interviewed in early May, when the problems with Carl Force

20  happened prior to that, when he was interviewed in November of

21  2014, and then later in the spring.  It was not until he was

22  told that charges were imminent that he came in and took

23  responsibility and pled guilty.

24      And even at that point, Your Honor, there were -- you

25  know, there were falsehoods that the defendant made to agents

1    investigating the corruption.

2         And the Court is aware of various other things along the

3    way in terms of post-plea agreement conduct, in terms of

4    attempts to change names and Social Security numbers.  All

5    these things have led to more and more restrictive

6    presentencing release conditions.  In fact, the Court released

7    him on rather restrictive conditions last fall after his --

8    after his plea.

9         We subsequently had another run-in with Mr. Bridges back

10   in Baltimore in which the Court added further to the release

11   conditions, basically confining him to his house under

12   electronic monitoring.

13        THE COURT:  I'm not sure what we do with that, though.

14   Because to some extent that's addressed by the additional

15   restrictions.  I mean, those -- what conduct on pretrial is, to

16   some extent, I think cabined by that period of time and we

17   address it, as we are required to do, and could lead up to

18   custody pending sentencing.

19        But I'm not sure it's an independent -- this is a

20   question, not a statement:  Is it an independent sentencing

21   factor to take into consideration or is it something that in

22   the moment needs to be dealt with in terms of what the release

23   conditions are.

24        MR. EVANS:  Your Honor, it's not necessarily a

25   independent factor; it's just a pattern of the conduct that I

1    wanted to bring to the Court's attention here.

2        This is not a case where the defendant, as laid out in

3    his pleadings, basically says when he was confronted he took

4    responsibility and there has tried to make it right since then.

5        There have been additional things.  Whether it's the

6    weapons, where he volunteered to turn over his weapons to

7    authorities that he owned -- which he did -- but then

8    subsequently his wife turned out -- presented the government

9    with a bill of sale from her attorney who claimed to have

10   bought them from her husband the day he was out here, for a

11   dollar, and that they now belong to her.

12       And then only when we raised issues about the legality of

13   such a sale of the type of weapons involved, did the request

14   for those to be returned to his wife, as opposed to him, kind

15   of go away.

16       There's just a series of things here, Your Honor, which

17   cause the government concern about his overall truthfulness and

18   so forth.

19       **THE COURT:**  Some of those issues might be addressed in

20   terms of the self-surrender issues.

21       **MR. EVANS:**  Well, that's just it, Your Honor.  That's one

22   of the things the government was going to be asking for today.

23       And just wanted to point out that this is not an instance

24   where he stole something once, when confronted, he confessed,

25   and that was it.  There's been a pattern of deception here

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 24 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 16 of 80

16

1    that's gone on for years.  And it's not just a matter of weeks

2    or months, Your Honor.

3          Your Honor, this is one of those cases, as well, that --

4    many of the cases that we deal with in public corruption,

5    specific deterrence is not necessarily an issue.  The

6    individual former contracting officer, or something like that,

7    they're not going to be in that position again.

8          The specific deterrence issue is not as big of a factor;

9    it's more general deterrence.

10          This, Your Honor, is a case we believe that both specific

11   deterrence and general deterrence are important factors.

12          As I indicated just previously, there's a pattern of

13   conduct here with the defendant that we find troubling and is

14   one of reasons we're going to be asking the Court to remand the

15   defendant into custody after sentencing this morning.

16          But Mr. Bridges was involved in numerous investigations,

17   in numerous seizures of bitcoins, of other digital currency,

18   which, Your Honor, we have no -- in some of these cases, have

19   no indication of where those currencies have gone, the extent

20   of those seized, and so forth.  There are a lot of unanswered

21   questions.

22          And one of the reasons why his --

23          THE COURT:  Your suggestion is that -- I'm not sure I

24   follow you -- that -- is that simply because the government

25   isn't in a position to have a handle on what some of the

1    conduct -- their own agent's conduct has been?  I mean, I'm

2    certainly not going to take the assumption that there's all

3    sorts of purloined funds out there floating around and

4    Mr. Bridges may someday have access to it, if that's what

5    you're suggesting.

6          MR. EVANS:  Your Honor, my point is only that -- as part

7    of the release conditions that Mr. Bridges is currently under,

8    is he can't even access -- he's not permitted to access

9    computers at this point in time.  And that's for a variety of

10   reasons.

11         But the point here is, Your Honor, this individual has

12   expertise in digital currency, in dark websites, and has had

13   access to these types of cases and has been involved in

14   seizures.

15         And that's one of the issues that my colleague will

16   address.

17         But the impacts of his conduct go well beyond this case

18   and affect many other cases.

19         And the specific deterrence component is still here with

20   Mr. Bridges, I believe, as well as the general deterrence.

21         Other law enforcement, other government officials, have

22   to know that if you undergo, or if you undertake this type of

23   conduct, that if you steal from the targets of your

24   investigation to line your own pockets, there's severe

25   penalties that you'll be facing, so that, in addition to the

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 26 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 18 of 80

18

1    specific deterrents as to Mr. Bridges -- I know defense counsel

2    says that he's learned his lesson, he's not going to be back

3    before any Court -- I don't feel fully confident of that,

4    Your Honor.  In fact, I think it's a concern the Court should

5    take into consideration, as well as the general deterrence

6    factor.

7          Now, in terms of the downward variance -- my colleague

8    will address the Court on the issue of the mental health.

9          But, Your Honor, I just want to say about the alcohol

10   abuse that's raised.  This is not -- as the guidelines discuss,

11   this is not ordinarily a reason for a downward departure.

12         Again, we're talking departures under 5(h)1.4.

13         To the extent that Mr. Bridges needs alcohol treatment,

14   the Bureau of Prisons is well equipped to provide that type of

15   treatment throughout his incarceration.

16         And my colleague will address the mental health issues at

17   this point, a couple of other items that the Court should be

18   aware of.

19         **THE COURT:**  Okay, Ms. Haun.

20         **MS. HAUN:**  Thank you, Your Honor.  I wanted to mention

21   three things and three reasons why I really believe that the

22   Court should impose a high-end sentence here.

23         The first is just the breathtaking abuse of trust that

24   the government and that the public has suffered at the hands of

25   Mr. Bridges.

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 27 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 19 of 80

19

1        One thing I've been clear to report to the Court --

2   Mr. Bridges and his lawyer already know this, of course -- but

3   I'm authorized to share with the Court that as a member of the

4   Secret Service Mr. Bridges served a joint-duty assignment with

5   the National Security Agency, Your Honor, during the time frame

6   of these events that led to this case.

7        So I'm not sure if Your Honor was aware of Mr. --

8        **THE COURT:**  I think it's actually in the presentence

9   report.

10       **MS. HAUN:**  Okay.  Well, Your Honor --

11       **THE COURT:**  Or it was, perhaps, in the sentencing

12  memoranda.  But I was alerted to that.

13       **MS. HAUN:**  Okay.  So as part of this joint-duty

14  assignment with the NSA of course Mr. Bridges had to fill out a

15  routine background check, and part of those questions ask if

16  there's any mental health issue.  And the queries were always

17  responded to negatively.

18       In addition, Mr. Bridges, as part of Secret Service, was

19  charged with guarding members of the First Family.  Again,

20  during the time frame here in this case.  In fact, one of the

21  items of discovery that was provided to defense counsel in this

22  case was a series of text messages in which Mr. Bridges engaged

23  with another member of Baltimore Silk Task Force, an IRS agent,

24  and the two of them were routinely talking about their trading,

25  how much money they were making in the market.

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 28 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 20 of 80

20

1    This is unclear if it was with the proceeds of the crimes

2    in this case.

3    While all the way Mr. Bridges, throughout this text

4    messages, is telling this other IRS agent "Hey, I'm guarding

5    Mrs. Obama right now."  While he's making these trades.

6    So I think aside from the fact that there's no indication

7    until now, until the prosecution of this case, that Mr. Bridges

8    has some mental defect, there's no -- there's never been a

9    suggestion throughout Mr. Bridges's somewhat lengthy career

10   with the Secret Service -- and certainly with law

11   enforcement -- that he was suffering from a mental defect.

12   So I think any kind of departure, for those reasons, is

13   inappropriate.  For the same reasons were in inappropriate in

14   the case of Mr. Force.  Who at least, in the case of Mr. Force,

15   had some suggestion of mental health issues during the time

16   frame of the events in question of his case.

17   The reason I raise the NSA and guarding the First Family

18   is, again, this is an agent with the Secret Service, a federal

19   agent.  And the way he abused the public trust, it cannot be

20   said that it was a simple one-off theft.

21   And by the way, even if it was a one-off theft, a one-off

22   theft by a member of a federal task force is one too many.

23   Which brings me to my second reason, Your Honor, that I

24   think that a high-end sentence is merited here.

25   The number of cases that Mr. Bridges contaminated, not

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 29 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 21 of 80

21

1    just existing criminal cases, but also investigations across

2    the country that his conduct has led to have to be shut down,

3    is truly staggering.

4         We start here -- there was a criminal investigation that

5    another district had into Mt. Gox that's had to since be shut

6    down.

7         **THE COURT:**  And your position is the shutting down of

8    those is entirely ascribable to the conduct of Mr. Bridges?

9         **MS. HAUN:**  I won't make representation it's 100 percent,

10   Your Honor.  Because of course it was in early stages of

11   investigation; I don't know whether other factors would have

12   ended up shutting it down as well.

13        But I can tell you that Mr. Bridges learned that there is

14   a criminal investigation afoot with respect to Mt. Gox.  And

15   what did he do?  He turned around with an AUSA in the Baltimore

16   office and did a civil seizure warrant of accounts belonging to

17   Mr. Karpeles, who was, at that time, the head of Mt. Gox.

18        But before he did that, two days before he did that, he

19   made sure to get all of his own money out.

20        The government's theory is that one of the reasons he did

21   this seizure warrant, Your Honor, is because he didn't want a

22   criminal case to proceed because if the US government ever got

23   Mt. Gox records they might see his own name on them.

24        But that's just one example.  I can tell you from my own

25   knowledge that in this district a number of investigations have

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 30 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 22 of 80

22

1    had to be shut down directly -- directly, a hundred percent,

2    because of Mr. Bridges.  And that's because in his role as a

3    digital currency expert he would fly across the country and

4    consult in different jurisdictions out on the West Coast, up in

5    Oregon, back on the East Coast.  He flew all over offering his

6    help and advice to other Secret Service agents and other

7    federal agents.

8         As a result of his name now being on those

9    investigations, they have had to be shut down.  So I think

10   that's another factor.

11        Again, even if it's one theft, it's one theft too many.

12        And the third reason, Your Honor, is because of the way

13   that Mr. Bridges set Mr. Curtis Green up entirely to take the

14   fall.

15        And you'll hear today from Mr. Green himself.  But one of

16   the things Mr. Green is going to tell you is how Bridges,

17   himself, was so intent, during the proffer -- now, of course

18   Green -- Mr. Green, was flipped.  He was going to cooperate

19   with the government.  So here he's sitting in a room of federal

20   agents, who he thinks he can trust.  He's made the early

21   determination he's going to come clean and he wants to

22   cooperate with the government.

23        And he'll tell you about how Mr. Bridges was so insistent

24   on learning exactly how to log into to his -- using his

25   administrative account and passwords, and he'll tell you, also,

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 31 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 23 of 80

23

1    that Mr. Bridges didn't just simply transfer approximately

2    21,000 bitcoins out to steal them, he transferred them to

3    Curtis Green's account.  And the reason why, Your Honor, is

4    because he wanted to have a suspect.  He wanted DPR, who's now

5    -- we know is Russ Ulbricht, he wanted other Silk Road vendors

6    and users to know, "Here's the person who stole my 1,000

7    bitcoins.  It's Curtis Green."

8         Curtis Green is going to tell you about the over 30 death

9    threats he had.  He's going to describe to you firsthand how he

10   was housebound for a year, Your Honor, and how he's been in

11   fear for his life.  Because of course Russ Ulbricht put out two

12   hit teams.  And one of the hit teams turned out to be the

13   Federal Baltimore Agent Task Force, but another one of those

14   hit teams, Mr. Green will tell you about, and he'll also tell

15   you about how he was threatened and told he would not be

16   getting a 5K a sentencing reduction because the prosecutor and

17   the other agents felt he was lying because certainly his own

18   credentials had been used to move 21,000 bitcoins.

19        And I think, together with the reasons that my colleague,

20   Mr. Evans, addressed, Your Honor, this case undoubtably merits

21   a high-end sentence.

22        And on that I would submit.

23        THE COURT:  Thank you.

24        I will hear from Mr. Green at this point, and then turn

25   to the defense.

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 32 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 24 of 80

24

1          Mr. Green, if you could come forward.  Come forward to

2     the podium, sir.

3          For the record, if you could give us your name.

4          MR. GREEN:  Curtis Green.

5          THE COURT:  Very well.

6          MR. GREEN:  Is it okay if I have Ms. Haun stand next to

7     me?

8          THE COURT:  Oh, sure.  Sure.

9          MR. GREEN:  You'll have to excuse me.  I get nervous, and

10    I just want to have her so she can keep me on the path.

11         THE COURT:  I recognize it's an intimidating place.

12         MR. GREEN:  Very much so.

13         MS. HAUN:  And Your Honor, just for the record, Mr. Green

14    is represented by criminal counsel in this case out in

15    Salt Lake City, Utah, and both of them were unable to travel

16    here today but asked that Mr. Green come and speak for himself.

17         THE COURT:  Very well.

18         So you may proceed, Mr. Green.

19         MR. GREEN:  Okay.  I guess I'll start back with the

20    proffer arrangement I had.  It was actually located in the

21    Secret Service building with -- oh, approximately -- I couldn't

22    tell you, 15, 20 -- what I was told was pretty much the entire

23    Baltimore Silk Road Task Force.

24         And they obviously offered me a proffer agreement with an

25    attached -- I don't want to get too much -- 5K, I'll leave it

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 33 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 25 of 80

25

1    at that.

2         And during the -- during the proffer agreement they

3    started out asking standard questions.  You know, how did I get

4    involved, you know, just the basic, you know, things.

5         And one of the things that --

6    THE COURT:  Which agents were there when they were

7    talking to you?

8    MR. GREEN:  There was --

9    THE COURT:  Was Mr. Bridges?

10   MR. GREEN:  Oh, absolutely.  He sat, I believe, right

11   across -- in fact, where this lady is sitting.  Almost the

12   exact same distance.

13        I lost my train of thought again.

14        And so they offered -- in the proffer agreement they told

15   me that, you know, as long as I told the truth and 100 percent

16   the truth, nothing could be held against me.  So obviously I

17   made sure that I told 100 percent the truth.  Every question

18   that they asked, I answered 100-percent truthful.  I mean, as

19   far as I knew it, obviously.

20        Anyway, after getting -- and we started, and we got to

21   the, you know, how to log in.  I showed them how to log in.

22        And the agents were just taking notes and asking simple

23   questions.  Mr. Bridges kept on asking me how to get in and

24   asking me specifics on how to -- "How do you change that

25   password?"  And I actually turned my computer towards him to

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 34 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 26 of 80

26

1    actually show him, since he was -- to show him exactly how to

2    do it.  And I think I showed him more than once.  And, in fact,

3    later on, right before he left to go move the bitcoins, he

4    asked me to show him one more time, and -- just to make sure

5    that he knew exact- -- because it was fairly com- -- you know,

6    fairly complicated.

7         He set me up to take the fall.  And what that did was

8    he -- he wanted DPR Russ Ulbricht to make sure that it was me

9    that did it.  And he knew that -- DPR knew who exactly who I

10   was.  And DPR Russ Ulbricht had, obviously, millions -- if not

11   hundreds of millions -- of dollars at his disposal.  Which, you

12   know, when you're dealing with a criminal, you know, you could

13   definitely put, you know, my life in danger.

14        And he also purposely put -- when he moved the bitcoins

15   he moved them into my account so it really looked like I did

16   it.  I mean, anybody looking into it would -- it would be a

17   no-brainer, saying, "Oh, obviously he did it."

18        And so he was very calculated.  It was very well thought

19   out, in my opinion.

20        And also, you know, I can't tell you how many -- how many

21   death threats I've received.  More than 30, and probably less

22   than 200.  One -- one death threat specifically told what they

23   would do to my grandchildren in very -- in great detail.  It

24   was very specific.  Which you -- I didn't want to ever repeat

25   it.

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 35 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 27 of 80

27

1      Fortunately, I only got one of those terrible -- I mean,

2  obviously all of them were bad.  He named my grandchild with

3  their full names, middle names, addresses.

4      And so you can imagine the mental stress and anguish that

5  it put me through.

6      Not only that, I was essentially, basically -- I guess

7  you would call it -- self-imposed house arrest.

8      Carl Force was one of the guys that Russ Ulbricht

9  happened to hire to kill me.

10      And then we faked my death, took photos and -- very

11  realistic, and sent them in.

12      And there was also a -- there was actually a second group

13  that was -- that was hired to kill me.  So I actually had -- I

14  had two, two different groups that were supposed to kill me and

15  my family.  And I didn't even know about the second group until

16  recently.

17      I'm so fortunate that so far nothing has happened.  You

18  know, they could kill me, but they still want to hurt my

19  family.  And like I said, I was -- I was house-bound for a

20  year, almost a year.  Ten, eleven months, I believe.  I didn't

21  leave -- it was about a 30-foot radius to my kitchen and I had

22  a bathroom in my room.  I had to have all my -- my blinds

23  drawn.

24      And Carl Force called me on a daily basis to make sure

25  that I was keeping low, not going out.

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 36 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 28 of 80

28

1     And I also -- and the one thing -- I don't even know if

2     Ms. Haun knows, but Carl, one day, called me and he said,

3     "You'll be -- you'll be receiving a call from Shaun Bridges.

4     Tell him whatever he needs to know."

5     And I'm, like, sure.  I'm helping, you know.  These are

6     the good guys.  They're there to protect me, which I thought.

7     And, obviously, I was just totally wrong.

8     And he did call me and we -- he talked about bitcoin and

9     I educated him.  I'm -- unfortunately, I wish I would have

10    never got involved in bitcoin, to be honest with you.  But I

11    educated -- you know, thinking I was helping the government I

12    educated Mr. Bridges and Carl Force on how bitcoin worked, how

13    to move bitcoin, how to essentially hide it.

14    And that's the one thing that I -- knowing bitcoin as

15    well as I do, I mean, I would consider myself an expert in

16    bitcoin because I've been there since the beginning, bitcoin is

17    extremely easy to hide.  I could have a billion dollars in

18    my -- on a thumb drive in my pocket right now and, you know,

19    unless you put it in there and on a computer, you know --

20    So when I heard them saying that, is there other money,

21    the bitcoins, you know, I can't speculate, I don't want to

22    speculate.  But I just -- to let you know, it is extremely,

23    extremely easy to hide.

24    Okay.  And the other thing that I was, you know, I would

25    say I was given a 5K.  And when they thought that I -- when

1  they discovered that all the bitcoins had been moved I was

2  immediately accused.   Immediately.   The attorney general

3  screaming at me -- the AUSA.   Yeah.   I'm sorry.   To me, they're

4  all the same.

5       The AUSA would -- "Come on.   You -- we know you stole it.

6  We know you did it."   And then another agent would pull me to

7  the side and say, "Come on.   They're the bad guys," you know.

8       And I kept on saying, "I -- I wish I could, you know."

9  And I kept on saying, "It doesn't make sense for me to steal

10  the money, the bitcoins.   If I was that type of person, why

11  would I steal it the night that I am in front of 15 agents?

12  I -- wouldn't I have done it the week before in the comfort of

13  my home?"

14       It just made no common sense to me whatsoever, and I

15  couldn't believe that they were accusing me.   It blew my mind,

16  just because there was -- anyway.

17       Okay.   Yeah.   And they were, like, they were going to

18  take my 5K away from me.   Herring -- Herring said -- said, "We

19  are going to take -- you know, we don't think you're telling

20  the truth and, since you lied to us, we're going to take that

21  away."   And that blew me away.

22       And I begged them for a lie detector test.

23       And Bridges -- not Bridges, Force, kiboshed, every time,

24  that.

25       But yeah, that was -- the 5K reduction was -- until they

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 38 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 30 of 80

30

1    found the real culprit, that 5K was taken off the table.

2          And finally I was vindicated and proved that I did not

3    steal that money because that money turned -- I think by the

4    time they turned it in it was close to a million dollars

5    instead of at the time it was 300,000, I believe.  Now it

6    turned into a million.

7          So anyway -- I think -- oh, one more thing I want to say.

8    You know, Mr. Bridges, being a federal agent, I believe, needs

9    to be held to a higher standard.  His crime definitely was not

10   victimless.  I am trying -- I am still trying to deal with the

11   emotional and physical pain that it has caused me.  I've lost

12   and gained 120 pounds two times since this has all happened.  I

13   have been diagnosed with post-traumatic stress disorder and am

14   seeing a psychologist for that.  And now that they -- just

15   ironically, the other guy that was kind of helping them kill me

16   was just arrested three days ago, which his name was Variety

17   Jones.  That's his pseudonym.  Thomas Clark, I believe, is his

18   real name.  And that kind of gives me a little comfort knowing

19   that he's now in custody because he was the other person that

20   really wanted me dead and who was helping, you know.  And I

21   just hope that, you know, I can now get my life back into

22   order.

23          And, like I said, this is definitely not a victimless

24   crime and what I went through was literally, literal, hell.

25          And thank you.

```
1        THE COURT:  Thank you, Mr. Green.  Thank you for coming
2    forward.
3        Mr. Levin.
4        MR. LEVIN:  Thank you, Your Honor.  We have two people
5    who have flown here from Maryland that would like to briefly
6    address the Court.
7        THE COURT:  Well, generally I don't have people
8    addressing the Court, other than counsel and the defendant.
9    Who are these people?
10        MR. LEVIN:  One is a former supervisor.
11        THE COURT:  That's why you submit material to me in
12    advance.  I don't generally have hearings where people come and
13    provide character evidence orally.
14        MR. LEVIN:  This was referenced in one of the filings
15    that we submitted to the Court that we indicated Ms. Barbara
16    Golden would be testifying.  There was no objection to that by
17    Counsel.
18        THE COURT:  Well, it's not how I generally proceed.  And
19    I was not -- I don't recall where you told me that.
20        MR. LEVIN:  It was filed in a court hearing where there
21    was some suggestion that Mr. Bridges was reporting a theft of
22    his wallet and backpack and we indicated, part of our argument,
23    that of course he was going to be here for sentencing because
24    he had made arrangements for Ms. Barbara Golden to speak on his
25    behalf.
```

1    THE COURT:  So that's buried in something.  It's not in

2    your sentencing memorandum.  That's what I'm looking at when

3    I'm preparing for this hearing.  So to expect me -- this is

4    some prior pleading somewhere that I'm supposed to go back and

5    find?  You're making a passing reference to this?

6         I mean, you need to tell me in advance what your plan is.

7    Because, quite frankly, that's not how I generally proceed.

8         Now, I will allow you to call -- very brief -- allow

9    people to come up -- hopefully it's a controlled number.

10        How many people are you proposing to bring up?  Here.

11        MR. LEVIN:  We have Ms. Golden and Mr. Bridges's wife,

12   who has a very short statement.

13        THE COURT:  Well, again, I get this material in written

14   form and I spend a great deal of time with it and I review it.

15   But our sentencing in this district doesn't usually involve

16   character witnesses orally providing input.

17        MR. LEVIN:  I understand that.  And I do apologize.  I

18   hope the Court will not hold that against Mr. Bridges.

19        THE COURT:  I'm not going to hold it -- certainly not.

20   But I'm not pleased that this is how you're proposing to

21   proceed at this point.

22        But go ahead.

23        MS. HAUN:  Your Honor, we don't have a problem with

24   Ms. Golden, although we've had no notice of this either.

25        However, with respect Ms. Esposito, who became

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 41 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 33 of 80

33

1    Mr. Bridges's wife during the pendency of this case, we have

2    some concerns, particularly as it concerns the grand jury

3    process and some privileges she's invoked before, as well as we

4    have some background that we could then provide.

5         THE COURT:  Well, that's why I'm -- this is not a trial

6    proceeding where witnesses are -- credibility is being

7    impeached.  That's why we don't do it this way.

8         MS. HAUN:  Right.

9         THE COURT:  However, I assume that the statements -- any

10   statements that are going to be made are going to be very

11   limited to sentencing factors and not going into anything that

12   perhaps would be of concern, if I understand your point.

13        MS. HAUN:  Well, I think, Your Honor, then the Court

14   should be aware that one week Ms. Esposito was subpoenaed to

15   the grand jury she was not Mr. Bridges's wife; they had been

16   together for approximately three years, as the government

17   understands it.  She asked for a week reprieve because of a

18   scheduling issue.  She asked the government and the agents if

19   the grand jury could accommodate her one week later.  We did

20   so.  In the intervening weekend, she married Mr. Bridges and

21   then invoked spousal immunity.

22        I think whatever comments Ms. Esposito shares with the

23   Court, the Court should have that background in mind.

24        THE COURT:  Very well.

25        MR. LEVIN:  She actually did not invoke marital privilege

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 42 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 34 of 80

34

1    initially.  She was willing to fly out here twice, and she did

2    fly out here twice, Your Honor, and spoke to the agents.  Only

3    when they threatened to prosecute her and call her before the

4    grand jury -- because they simply didn't believe her -- that's

5    when, on advice of her counsel, she invoked marital privilege.

6         THE COURT:  This is not Ms. Esposito's case, this is

7    Mr. Bridges's.  So I want the focus to be on the sentencing

8    factors pertaining to him.  This is one of the reasons, again,

9    that if this had been presented in an appropriate fashion

10   perhaps these issues could have been fleshed out.

11        But let's proceed.

12        MR. LEVIN:  Thank you, Your Honor.

13        THE COURT:  Are you proposing to have these people talk

14   to me before you present your discussion?

15        MR. LEVIN:  Yes, Your Honor, if that's okay with the

16   Court.

17        THE COURT:  All right.  Go ahead.

18        MR. LEVIN:  Thank you.

19        Ms. Barbara Golden.

20        MS. GOLDEN:  Thank you, Your Honor.

21        THE COURT:  Good morning.  If you could give us your

22   name?

23        MS. GOLDEN:  Barbara Golden.

24        MR. EVANS:  Your Honor, just inquiring whether the

25   witnesses are going to be placed under oath.

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 43 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 35 of 80

35

1    THE COURT:  No.  That's -- no, I would be receiving this

2    in the letter form, which is how I would have preferred it.  So

3    that's how I am going to be receiving it.

4        Go ahead.

5    MS. GOLDEN:  Thank you.

6        Your Honor, I've spent my entire adult life in the law

7    enforcement community, specifically a 37-year career with the

8    U.S. Secret Service.  I rose through the ranks and was

9    privileged to be selected as the special agent in charge of the

10   Baltimore field office.

11       When I reported to this position in 2007, the office was

12   understaffed and overworked, with both investigative and

13   protective assignments.

14       Then-President Bush spent almost every weekend at Camp

15   David; then-Vice President Cheney spent weekends at a home in

16   St. Michaels, Maryland, both of which required significant

17   manpower.  I was able to justify to our headquarters the need

18   to increase the staffing in the Baltimore office.  Some of

19   these additions were agents transferring from protective

20   assignments in Washington, D.C., but a majority were new hires

21   applying for a special agent position.

22       As the special agent in charge, I had a great amount of

23   say in who would either be assigned or hired in Baltimore.  I

24   was very involved in the hiring process and conducted both

25   one-on-one initial interviews and three-member panel

1    interviews.  The latter was the occasion in which I met Shaun
2    Bridges in 2009.
3        This involves three agents asking the applicant 20
4    pre-selected questions; some being situational scenarios,
5    others straightforward.
6        I recall Shaun first describing his career with the
7    Maryland State Police.  He was a decorated trooper, a member of
8    the Fugitive Task Force, and an instructor at the state police
9    academy.  His desire was to further his career in law
10   enforcement and to become a federal agent.  We then spent the
11   next hour conducting the panel interview.
12       Shaun never hesitated in his answers, he was confident
13   but never cocky, he brought to the table past experiences as a
14   trooper, which helped form his answers to the questions
15   presented, and he was very engaged with all three agents under
16   the stressful situation.  He struck me as a loyal and caring
17   law enforcement professional.
18       Several months following the panel interview Shaun was
19   approved for the special agent position he had applied for.  I
20   was instructed to offer Shaun a position in one of four cities:
21   New York, Jacksonville, St. Louis, or Cleveland.  Although
22   excited for this opportunity, Shaun explained he would suffer a
23   significant loss on a sale of his current residence.  I took
24   that argument to our headquarters, cited the current workload
25   the office was experiencing and the fact that I was very

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 45 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 37 of 80

37

1    impressed with Shaun and wanted him on my team.  I was able to

2    have Shaun assigned to the Baltimore field office.

3         Shaun immediately went through the extended training

4    requirements, both at the federal law enforcement training

5    center in Glenco, Georgia, for approximately 12 weeks, and the

6    Secret Service rally training in Laurel, Maryland, for another

7    16 weeks.  There Shaun excelled and was named first in his

8    class of 24 trainees in the academic category, which I

9    witnessed at his graduation.

10        Again, I was very impressed with Shaun.

11        Shortly after graduation I had had occasion to speak with

12   the commandant of the Maryland State Police, Colonel Terry

13   Sheridan.  Inside I was gloating that I had hired one of his

14   decorated troopers.  Shaun was ranked number one overall in his

15   trooper class.  Colonel Sheridan acknowledged his loss and

16   instantly knew and recited Shaun's accomplishments with MSP.

17        I believe this sparked a thought in Colonel Sheridan that

18   he had also lost an instructor at this academy.  Colonel

19   Sheridan soon launched an effort to borrow Shaun to continue to

20   teach criminal law at their MSP Academy.  I received a letter

21   from the commander of the MSP Academy requesting Shaun be

22   allowed to continue instructing.  To continue my professional

23   partnership and liaison with the Maryland State Police, that

24   request was granted.  And this only added to my confidence in

25   Shaun.

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 46 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 38 of 80

38

1      Over the course of Shaun's career with the Secret Service

2   he taught approximately ten Maryland State Police Academy

3   classes totaling approximately 500 troopers.  Not once did this

4   interfere with the demands placed on him by the service.  And

5   he continued to meet and balance every protective and

6   investigative assignment with enthusiasm.

7      During this juggle of assignments and shortly after Shaun

8   began his Secret Service career, he went through a divorce,

9   which was emotionally devastating.  Shaun volunteered for

10  protection assignments in an effort to keep busy.  He worked

11  his cases diligently and never complained.

12     Shaun is an emotional person, and at times it was evident

13  that this divorce deeply hurt him.  But he never made this an

14  excuse to avoid his responsibilities; he met each and every

15  one.

16     In early 2011 Shaun expressed an interest in and attended

17  the Secret Service Electronic Crimes Special Agent Program,

18  which trains agents in computer forensics and electronic crimes

19  investigations.  Shaun easily excelled in this field.  Shaun

20  also made the most significant seizures in the Baltimore

21  office.  He was the only special agent to work counterfeit coin

22  cases and made three large seizures from China totalling

23  several thousand dollars, which no one, to my recollection, had

24  ever done.

25     Shaun began working on the Silk Road investigation as an

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 47 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 39 of 80

39

1    offshoot of the counterfeit coin investigation, which now

2    involved virtual currency known as "bitcoins."  Because of his

3    grasp on the concept of virtual currency, Shaun was asked by

4    the FBI to sit on their virtual currency working group at the

5    FBI headquarters.  Shaun's first-line supervisor approved the

6    request and Shaun attended monthly meetings, offering advice

7    and sharing intelligence.

8         Another request for Shaun's assistance came from the

9    Department of Justice's Asset Forfeiture Money Laundering

10   section in Washington DC.  Shaun was to represent the Secret

11   Service on this committee to provide guidance on seizures

12   relating to virtual currency.

13        This was, again, approved by Shaun's first-line

14   supervisor with my blessing but it was rescinded by our own

15   headquarters after just a few meetings.  It is my belief that a

16   supervisor above me did not feel it appropriate for a GS-13 to

17   sit on a panel of this caliber, yet no substitute of a higher

18   grade was made that I'm aware of.

19        Shaun's expertise continued to be sought after by the FBI

20   and he accompanied a Baltimore supervisor, along with Secret

21   Service Deputy Assistance Directors, to the FBI headquarters to

22   brief FBI Assistant Director Demarest on the current status of

23   virtual currency.

24        This meeting occurred following my departure from the

25   Baltimore office, but I can attest to the multiple seizures

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 48 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 40 of 80

40

1    Shaun made involving virtual currency.  These seizures totaled

2    several million dollars, which made the GS-15 Baltimore field

3    office number one service-wide.

4         With regard to comments made by the government in their

5    sentencing memo about Shaun leaving one of his computers in a

6    wipe area in our computer lab, I can attest that no Secret

7    Service-issued equipment is ever randomly or deliberately wiped

8    clean by an agent or a police officer that is assigned to that

9    lab.  Work stations are barely delineated due to the size of

10   the lab itself.  Overhead cabinets are utilized for storage of

11   forensic equipment -- cables, disks, et cetera -- which Shaun

12   obviously knew, having been assigned to the lab since 2011.

13   Evidence that is to be examined by a trained forensic

14   technician must be accompanied by a request from an agent or an

15   agency with instructions as to what type of evidence they're

16   seeking, whether it be credit card numbers, distinct

17   trafficking in credit card numbers, child pornography, or

18   whatever type of case is being investigated.  Hard drives from

19   suspect computers are labeled as evidence and maintained as

20   such in a locked vault, as is the computer lab.

21        To my knowledge, there was a small area that was not

22   someone's work space where hard drives or computers were set

23   aside and were labeled or marked in some way indicating they

24   were ready to be wiped.  Approval to do so came from either a

25   prosecutor at the end of all judicial action or a supervisor

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 49 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 41 of 80

41

1    before any suspected equipment was returned in a nonjudicial

2    investigation.

3         No one without instruction just randomly wiped computers

4    in the computer lab, as there is a priority to ensure that no

5    one did -- that no one did wipe a computer by accident, for

6    obvious reasons.  A Secret Service computer bearing a Secret

7    Service property number would never be wiped in the lab by

8    either a special agent or an officer assigned to that lab.

9         Since the computer that Shaun placed in the computer lab

10   was utilized by him for his computer forensic investigations,

11   it was the most logical decision, to place it in that lab.

12   Other agents would recognize the equipment as Secret Service

13   property and know that its purpose was for computer forensic

14   investigations.

15        Prior to his retirement from law enforcement, Shaun did

16   an extraordinary job as a Secret Service agent and I was proud

17   to have him on my team and on my side.  He has been through

18   hell past year, but I know he is at least, in part, relieved to

19   be able to start the rehabilitation process.  I pray he's given

20   a chance to prove himself once again.

21        **THE COURT:**  Thank you.

22        Mr. Levin.

23        **MR. LEVIN:**  Thank you, Your Honor.  If it's okay with the

24   Court, Ms. Esposito has a much more brief statement.

25        **THE COURT:**  Very well.

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 50 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 42 of 80

42

1        MR. LEVIN:  Thank you.

2        THE COURT:  Good morning, and if you could give us your

3  name.

4        MS. ESPOSITO:  All right.  Arianna Esposito.  I would

5  like to thank this Honorable Court for giving me the

6  opportunity to speak on my husband's behalf.  I acknowledge

7  that Your Honor has heard from countless mothers, fathers,

8  spouses, and children of the defendant, pleading for mercy for

9  their loved one, and, as such, what I have to say may not seem

10  different in the Court's eyes.  However, all I have the

11  capability of offering before you today is to share with you

12  the truth about my husband.

13        The truth is, my husband -- my husband's contributions to

14  law enforcement within our state are extraordinary, and such is

15  acknowledged before this Court, by the honorable governor,

16  another former superintendent of the state police, and former

17  head of the Secret Service for the State of Maryland, who is

18  present in this courtroom today.  My husband has spent more

19  than a decade devoting himself to the citizens of Maryland and

20  has been recognized for saving lives on countless occasions.

21  My husband has served in many capacities of law enforcement

22  within our state.  One of those such capacities was as a

23  hostage negotiator where he successfully negotiated the safety

24  of many adults and children over the years who would not be

25  here today if it was not for his actions of courage.  He has

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 51 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 43 of 80

43

1  received a plethora of commendations ranging from bringing to

2  justice some of the most violent fugitives to placing himself

3  in the midst of gunfire to save the lives of innocent

4  bystanders.

5      It is easy for us to forget all that he has sacrificed,

6  and instead judge him based a single spontaneous act that

7  snowballed.  My husband has accepted responsibility for his

8  actions.  And over two years passed before any charges were

9  brought against him.  During the years that passed after this

10  incident, my husband was not involved in any wrongdoing other

11  than that which has connected to the original incident.  This

12  shows that the theft was out of the ordinary.  And instead of

13  engaging in other wrongdoing, my husband, in the following

14  years, received commendations and rose to positions in greater

15  responsibility due to his work ethic and dedication to the

16  citizens of our state.

17      I make no excuse, nor does my husband, for his actions.

18  He has accepted responsibility and will forever live with the

19  consequences of his actions.  I ask you to move forward in

20  sentencing my husband, that you take a holistic approach,

21  taking all of these facts into consideration, and that

22  sentencing my husband for a long period of incarceration does

23  nothing but victimize me further.

24      I understand Your Honor is outraged by my husband's

25  conduct and, as such, he shall and will pay a heavy price for

1   the rest of his life, as he has already lost everything.  My

2   husband has already learned from his mistake, and I

3   respectfully request that you consider such, in determining his

4   sentence and possible leniency.  Thank you.

5        THE COURT:  Thank you.

6        Mr. Levin.

7        MR. LEVIN:  Thank you, Your Honor.

8        Your Honor, I wasn't planning to address Ms. Green's

9   comments first, but I think I have to because they may color

10  the entire proceeding and I think it's worth noting.

11       First of all, it's terrible what Mr. Green has been put

12  through.  I don't think anybody doubts that.  And the death

13  threats are inexcusable and outrageous.  However, Your Honor,

14  the death threats are a result of the fact that Mr. Ulbricht

15  learned that Mr. Green was cooperating.  They are not because

16  Mr. Green allegedly had stolen bitcoins.

17       THE COURT:  How do we know that?

18       MR. LEVIN:  Well, Your Honor, if I may, I have a chat

19  between Russ Ulbricht and Carl Force.  And this is shortly

20  after --

21       THE COURT:  I have to tell you, quite honestly, I don't

22  think that is particularly significant.  It could have exposed

23  him to very serious threats and consequences.  Whether or not

24  it actually is the motivation behind the threats, okay, I'll

25  assume for purposes of discussion it isn't the direct

1    motivation.  But you're not disagreeing with the simple fact

2    that it put Mr. Green in harm's way.

3         MR. LEVIN:  I'm not disagreeing with that at all,

4    Your Honor.

5         THE COURT:  So whether or not the threats that he

6    actually received emanated from the understanding that

7    Mr. Ulbricht reached that he was cooperating or because of the

8    theft, I'm not sure is of great consequence.  But go ahead.

9         MR. LEVIN:  Well, candidly, Your Honor, I feel like the

10   Court's being misled when it is told that because of the theft

11   Mr. Ulbricht wanted to kill Mr. Green.  That is simply not

12   true.  In fact, in a chat between Mr. Ulbricht and Carl Force

13   shortly after the theft, Mr. Ulbricht writes to Mr. Force --

14   This is Ulbricht:  "If you can get someone to force him" --

15   meaning Mr. Green -- "to return the stolen funds, that would be

16   be amazing."

17        Mr. Force:  Personally, I don't want any contact.  I'm

18   clear.  If you want something done, I can help you discreetly.

19        Mr. Ulbricht:  What do you mean?

20        Mr. Force:  Do you want him beaten up, shot, just pay the

21   visit?

22        Mr. Ulbricht:  I'd like him beaten up and forced to send

23   the bitcoins he stole back.  Sit him down at his computer and

24   make him do it.

25        Then he writes:  Beat him up only if he doesn't comply, I

1    guess.

2         It's only later, when Mr. Ulbricht learns -- because

3    local law enforcement in Utah disclosed the fact publicly that

4    Mr. Green had been arrested -- that Mr. /OL brick learned of

5    the arrest and worried that he was cooperating, and that's when

6    Mr. /OL brick writes to Carl Force.  "He was on the inside for

7    a while, and now that he's been arrested.  I'm afraid he'll

8    give up information."  And that led to Mr. /OL bright wanting

9    to have him murdered.

10        It's inexcusable what Mr. /OL brick did, it's inexcusable

11   that Mr. Bridges stole the bitcoins, but frankly, Your Honor, I

12   think the Court's being misled when it's told that the threats

13   of murder were a result of the stolen bitcoins.

14        THE COURT:  Is also inexcusable for a federal agent to

15   put a cooperating witness in that kind of situation, whether or

16   not anybody acts upon it.  It's utterly inexcusable.

17        MR. LEVIN:  We're not disagreeing, Your Honor.

18        THE COURT:  Well, then, I understand your point, that I

19   need to take it into context and realize other things were

20   going on.  And I take your point.

21        MR. LEVIN:  And we heard today that bitcoins were

22   transferred to Mr. Green's account.  This is the first we're

23   hearing it.  That's not in the plea agreement.  I don't know

24   that that's accurate, that Mr. Bridges somehow transferred

25   bitcoins into Mr. Green's account.  We know from charts that

1  were attached to the criminal complaint that Mr. Bridges stole

2  bitcoins and transferred them to Mt. Gox.

3       So today's the first time I'm hearing -- and we object to

4  it -- any suggestion that Mr. Bridges transferred bitcoins to

5  Mr. Green's account.

6       And today is the first day, first time, I'm hearing that

7  Mr. Bridges lied on May 28th, 2014, or lied on November 14th,

8  2014, or -- in fact, what Mr. Bridges agreed to in the plea

9  agreement is that he misled agents on those dates and what he

10  misled them about was his role.  So he never says he lied, but

11  he didn't confess, Your Honor.  So he has accepted

12  responsibility that he misled the agents who were interviewing

13  him because he did not confess to the theft, but today we're

14  hearing he lied.  Whereas, what he agreed to and what the

15  government agreed to is that he misled.  And our position is he

16  did -- he did not confess at that time, although he did confess

17  the very first day he appeared in this court.

18       Your Honor, there is little doubt that sentencing is the

19  most difficult part of your job, if I can say that.  I just

20  think it must be.  Because it's not like ruling on a motion

21  that either the law is there or not, or a verdict -- if there's

22  a bench trial -- the facts and the law come together.

23       But here -- Your Honor has done this many times -- has to

24  look.  And I know you do because Your Honor has indicated

25  you've looked at everything.  And I know you listened to our

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 56 of 129
Case 3:15-cr-00319-RS  Document 109  Filed 01/14/16  Page 48 of 80

48

1    witnesses and you're not just going to sentence on the crime

2    but also bear in mind the actor and his past accomplishments,

3    his future, his future potential, his efforts to rehabilitate,

4    along with many other factors.

5        And if Your Honor were just going to sentence him on the

6    crime, we wouldn't need a hearing; we could just ask the

7    government what he should get and be done with it.  That's not

8    how we do it.

9        So I appreciate the fact that Your Honor has a very

10   difficult job and will consider all the relevant factors.  And

11   that's why I do bring up these points, Your Honor.  Because I

12   don't want to leave here knowing that I could have said

13   something -- even if it's not relevant, necessarily, to

14   Your Honor's analysis -- we don't want the Court to be misled.

15       And with respect to the charge, Your Honor, there's

16   little that I can say that would lessen the seriousness of

17   Mr. Bridges's actions.  And there are no excuses.  We're not

18   making excuses, Mr. Bridges has not made excuses.  And, from

19   the first day he appeared in the courthouse, he spoke with the

20   prosecutors.

21       Mr. Bridges knows he acted foolishly.  That's an

22   understatement.  But -- he knows that he acted foolishly when

23   he stole the bitcoins.  But he's not a fool.  He knows his

24   actions affected the integrity of the judicial system, his

25   actions violated the trust that his government placed in him,

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 57 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 49 of 80

49

1     and he has acknowledged all of that.  He's acknowledged a lot,

2     Your Honor.

3          And when Mr. Bridges was finally charged and he came in,

4     he knew, like any defendant, Your Honor, he had three options:

5     He could plead guilty; he could plead guilty and cooperate; or

6     he could force the government to meet its burden.

7          In a sophisticated case, as Your Honor has indicated,

8     this would not have been an easy case to try.  Frankly, the

9     state -- the Northern District of California, I don't believe,

10    had jurisdiction over money-laundering charges, but Mr. Bridges

11    waived any issues with respect to venue and agreed to have

12    everything resolved here.  That saved the government tremendous

13    resources and efforts.  Obviously, it helped Mr. Bridges too.

14    We don't deny that.  But there was a benefit there to the

15    government having Mr. Bridges come in on the very first day and

16    allowing prosecutors, busy prosecutors, to move on to other

17    cases.

18         So Mr. Bridges knew he had three choices.  He didn't

19    waste any time making that decision.  He'd spent two years

20    waiting for this day to come, and the day came.  And he knew

21    right away he was going to plead guilty and cooperate.

22         And he did try to cooperate, Your Honor, not so much for

23    the purpose of the 5K.  Usually a 5K, as Your Honor well knows,

24    is when you can give the government somebody else.  And

25    Mr. Bridges knew he couldn't give the government somebody else.

1    But, still, the government indicated, even knowing that he was

2    a lone actor, would assist the government because then they

3    knew they could stop looking, that he wasn't in cahoots with

4    somebody else.  And he came in and he acknowledged what he had

5    done in Utah in January of 2013 and so he gave -- Mr. Bridges

6    gave the government --

7        THE COURT:  Let me just ask you.  I want to make sure I

8    understand this.  Beyond finally fessing up, what did he -- are

9    you contending he provided some sort of additional assistance

10   to the government?

11       MR. LEVIN:  Well, what the government told him before he

12   even proffered -- and what I've tried to indicate -- is that he

13   did this by himself.  The government didn't know if he had been

14   working with other people to launder the funds.

15       THE COURT:  I see.

16       MR. LEVIN:  And there was value -- the prosecutors even

17   said there was value in knowing that he acted alone.  So

18   that's -- that's the point, Your Honor.

19       THE COURT:  All right.  I understand.

20       MR. LEVIN:  Okay.  So I understand Your Honor's point --

21   well, when he finally fessed up -- Your Honor, my position is

22   having done this on both sides as a federal prosecutor and

23   defense attorney, this wasn't, finally, fessing up; this was

24   coming in earlier, the very first day he's charged.

25       Now, usually people don't come in and confess during the

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 59 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 51 of 80

51

1    investigation; it's after they're charged.  And once he was

2    charged he immediately made the decision to plead guilty and

3    try to cooperate.

4         So now unfortunately, on March 30th, the day Mr. Bridges

5    appeared and he spoke to law enforcement, he misled them.  And

6    he's acknowledged that in the plea agreement.  He tried to

7    hide -- I won't say her name, but there's a reference to "EP."

8    And he tried to hide EP's activities as a Secret Service

9    employee.  She wasn't permitted to allow Mr. Bridges access to

10   FinCEN.  She did, and unfortunately he did try to protect her,

11   and he's acknowledged that in the plea agreement.

12        Still, he did eventually do everything that one would

13   hope he would do after March 30th.  He signed a plea agreement;

14   he pled guilty; he waived venue; he returned all the money he

15   could.  And I don't think that can be overstated.

16        He didn't -- he didn't use the money to travel, to fund

17   extravagant parties, to eat particularly well, to eat well at

18   all.  Your Honor can see that he's skin and bones.  He

19   doesn't -- he didn't use this money and enjoy it.  He was

20   stressed for two years after he stole it.  It was sitting in

21   the account.  He paid taxes.  And for that, Mr. Bridges, he

22   can't win for losing, as they say.  Either he pays taxes -- and

23   the argument is he was trying to make it look legitimate -- or

24   he doesn't pay taxes and he's trying to cover his trail.

25        But he did pay taxes.  And, for that, there is something

1    to be said for that, Your Honor.

2           So all of the money that was available has been returned,

3    I believe.  I mean, I base that on helping facilitate that

4    process with the Asset Forfeiture Section of the Northern

5    District of California.  Some money was simply lost because of

6    the marketplace.  As a result of capital losses, there's not

7    the original $850,000.  And this point perhaps it's -- it's

8    worth noting -- I know Your Honor's well aware of this -- that

9    Mr. Bridges stole $350,000 worth of bitcoins.  Because of the

10   market that went up.  And but for that, we'd be looking at a

11   guideline range two levels lower.  I think it's 46 to 57

12   months.

13          And so when fashioning a fair sentence -- and I'll try

14   not to repeat this later -- we just ask that Your Honor

15   consider the fact that the guidelines are what they are because

16   of something that was completely out of the control of

17   Mr. Bridges.

18          If they had risen -- if the bitcoins had risen to a value

19   of ten million dollars, I'd be making the same argument.  If

20   they had decreased to a minimal value, I think the government

21   would be making an argument that we should be looking at

22   something higher because that's the value of the bitcoins when

23   he took them.

24          Your Honor, I don't know that this needs further

25   addressing, but the government does make the -- think the

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 61 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 53 of 80

53

1    suggestion that Mr. Bridges was hoping to wipe his computer by

2    placing it where he placed it, I think that's being covered by

3    Ms. Golden.  But that's really Mr. Bridges's own fault, that

4    he's now in the position that everything he does is looked at

5    with suspicion.  And that's something Mr. Bridges has put upon

6    himself and he will continue to have to deal with that the rest

7    of his life.  Every time he does something, there's going to be

8    this cloud of suspicion over him.  Rightly or not.  I mean,

9    sometimes, sure, that's why we consider people's criminal

10   history when they apply for a job, is that is this person going

11   to be honest?  Can we trust this person when he comes to work

12   with us?

13       Just during the pendency of this case, Your Honor, every

14   time Mr. Bridges does something, it's questioned, it's not

15   believed by the government, even when we have documentation to

16   demonstrate otherwise.  For instance, with respect to reporting

17   a crime -- Mr. Bridges was the victim of a crime in Maryland --

18   he reported it right away to Baltimore city.  He filed a police

19   report, he contacted the credit card companies to find out if

20   there was any use of the credit cards, he asked for a credit

21   report.  This was all within a matter of days, two weeks before

22   he was asked to come into the federal courthouse for a hearing

23   or even knew that this was an issue.

24       And I say this now -- and I realize that this is really

25   going to go to the issue of self-surrender -- but everything he

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 62 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 54 of 80

54

1    does now falls under this cloud of suspicion, even though he

2    was a victim of a crime.

3         And it's not even clear what the government's theory was.

4    And the magistrate judge, frankly, recognized that it wasn't

5    clear what the government's theory was.  He was reporting a

6    theft for what purpose?  So that he could try to get a

7    replacement ID that would allow him to do what?

8         None of it really made sense, if Your Honor looked at it

9    with -- and the judges that heard that couldn't quite

10   understand -- in my opinion, they couldn't quite understand

11   what the theory was.  But that's on Mr. Bridges for putting

12   himself in this position.

13        Another example, Your Honor, would be the fact that two

14   days after the last transfer of money was made from Mt. Gox to

15   Fidelity Mr. Bridges served -- was the affiant on the seizure

16   warrant.  The two -- the two events had nothing to do with each

17   other.  The fact that there was a transfer was already in

18   place; it was automatic.  And it was only days before the

19   seizure warrant that Mr. Bridges was notified -- and the

20   government knows this.  Only a few days before the seizure

21   warrant, Mr. Bridges was notified he'd be the affiant.  He had

22   no choice in the matter.  He was told he would do it.

23        THE COURT:  It's rather coincidental.  I mean, seriously.

24   It's -- within a very short period of time he knows he's going

25   to be an affiant on the seizure warrant, and the funds he knows

1    that he claims are in there, he gets out before that.

2         I mean, it's pretty --

3         MR. LEVIN:  He doesn't get them out -- I understand,

4    Your Honor, but he doesn't get them out.  That's part of being

5    under this cloud of suspicion.  It's automatic.  Once the --

6         THE COURT:  Well, he's putting it all in motion.  I mean,

7    he -- are you saying he has no idea this can happen to his

8    funds?  Granted, he doesn't have to trigger the actual event.

9    I understand your point.  But he's also not clueless that it's

10   going to happen.

11        MR. LEVIN:  He knows that in January of 2013, when he set

12   up the account at Mt. Gox, that Mt. Gox allowed him to place a

13   ceiling on the funds so that because Mr. Bridges used his own

14   identification Mt. Gox set in place that every time the

15   bitcoins reached a value of a hundred thousand dollars

16   automatically they would be transferred to Fidelity.

17        So he was involved, he was passively involved, because he

18   didn't know when it would reach a hundred thousand dollars.

19   And each time it did it was transferred to Fidelity.  It is a

20   coincidence that the same month the last transfer is made he's

21   an affiant.  But he didn't decide to be the affiant.  He was

22   appointed to be the affiant only days before the actual seizure

23   warrant was served.  And by being the affiant, he did nothing

24   to affect the investigation.  He didn't try to hide his

25   account.

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 64 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 56 of 80

56

1     So again, these do look suspicious, but the two events

2 are not related to one another.  But again, because of what he

3 did in stealing the bitcoins, he's forever going to be looked

4 at with this suspicious glance.

5     In the same vein, Your Honor, it's my understanding,

6 based on the discovery, that it was Mr. Bridges who helped turn

7 in Carl Force.  By turning in Carl Force -- if my understanding

8 is correct from the review of the discovery -- I think that was

9 in the complaint -- if that's correct, then Mr. Bridges really

10 caused his own -- his own downfall.  Because once Mr. Carl

11 Force was being investigated, ultimately Shaun Bridges was

12 investigated.

13     So I harken back to what Mr. Bridges's wife said, that

14 even after his misconduct he tried to work hard and tried to

15 work with some ethics, Your Honor.  And, in fact, he was

16 still -- Mr. Bridges is the one who reported Carl Force to his

17 supervisors at the Department of Justice.  And that ultimately

18 led, I believe in part, to Mr. Bridges being uncovered as

19 having taken the bitcoins.

20     In their sentencing memo the government suggests that

21 Mr. Bridges's misconduct went on for months, if not years.

22 Your Honor, that's -- that's an exaggeration.  His misconduct

23 occurred in January 2013.  The transfer of monies occurred for

24 a period of two months thereafter.  That's a couple of months.

25 That's not -- and again, we're not standing here, Your Honor,

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 65 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 57 of 80

57

1    saying, "Oh, it's okay because it only occurred for two

2    months."  I simply don't want the Court to read something --

3    and I know that you gave the Court -- the prosecutors some

4    pushback this morning on an overstatement of perhaps there are

5    cases outside this jurisdiction that failed because of

6    Mr. Bridges's actions.  But Your Honor pushed back, and perhaps

7    not solely because of Mr. Bridges's conduct.

8         So it doesn't -- it certainly doesn't make Mr. Bridges's

9    conduct right, but it is more of a one-off in the continuing

10   course of misconduct for years that Your Honor saw in the

11   Carl Force case.

12        To be sure, none of this lessens the seriousness of

13   Mr. Bridges's actions.  But I hope it suggests that Mr. Bridges

14   acted impulsively in January 2013, and at least since April of

15   2015 he's done everything he could do to make amends.

16        And that leads us to looking at Mr. Bridges, the person,

17   and not Mr. Bridges, the criminal.  Although he will be forever

18   defined for his actions in January 2013 as a criminal, there's

19   an entire life before that night that is worthy of

20   consideration.

21        I know Your Honor's read the sentencing memo and will

22   consider Mr. Bridges's contributions both before and after his

23   extraordinary lapse in judgment.  But he is a great deal more

24   than what has bought him into this courtroom, and the

25   collateral consequences his actions are, for him, not so

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 66 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 58 of 80

58

1     collateral.  He's lost his profession, his livelihood, his

2     reputation, been a national disgrace.  There will be a

3     continued national disgrace after today's hearing.  He'll lose

4     his freedom.  And while he's serving his term of imprisonment,

5     his conditions will be much harsher than those of the average

6     prisoner.

7          I think Your Honor is well aware of that because of his

8     status of a former law enforcement officer.  And I've certainly

9     represented a number of law enforcement officers who have been

10    sent to Bureau of Prisons, and their conditions of confinement

11    are much worse.  They do stay in solitary confinement for many

12    hours during the day.  It's for their own protection.  But it

13    doesn't make it any easier.  It's a harsher period of

14    confinement.

15         We ask that Your Honor consider all of that in imposing a

16    just and fair sentence, Your Honor.  Thank you.

17         THE COURT:  Thank you.

18         Mr. Bridges, this is your sentencing.  You have a right

19    to speak directly to me.  You're not required to do so; it's

20    totally your choice.  But if there is anything that you wish to

21    say, now would be the time to say it.

22         MR. LEVIN:  May he have a moment?

23         THE COURT:  Yes.

24         MR. LEVIN:  Your Honor, there are a few things

25    Mr. Bridges would like me to share with the Court, and then I

1   think he does also wish to speak, if that's permissible.

2        THE COURT:  All right.

3        MR. LEVIN:  This is not a sentencing hearing for

4   Mrs. Bridges, as Your Honor already indicated.  But when I went

5   through the consequences, the collateral consequences to

6   Mr. Bridges, in addition to those --

7        Incidentally, Your Honor, by losing his job Mr. Bridges

8   had no health care.  He had been in a relationship with

9   Ms. Esposito, and they decided, in large part -- not only

10  because they were in love -- but they decided to get married so

11  that Mr. Bridges could get health care coverage.  In fact, he

12  has medical issues, which we can talk about after sentencing,

13  in terms of issue of self-surrender.

14       But that's why they got married, and that's why I felt

15  like it was important to point out that Mrs. Esposito did speak

16  with the prosecutor and it was only upon the advice of counsel,

17  when prosecutors indicate they did not believe her and wanted

18  her to appear in front of the grand jury, that Ms. Esposito

19  invoked her marital privilege.

20       What Mr. Bridges would like me to point out, Your Honor,

21  is that, at the time, Ms. Esposito was going through Maryland

22  State Trooper Academy training to be a Maryland State Trooper.

23  When Ms. Esposito returned to Maryland after having flown out

24  to San Francisco, she was informed by her supervisors at the

25  academy that they had learned she had invoked her marital

1   privilege and they terminated her.

2        Ms. Esposito has an employment lawyer and she is trying

3   to get her job back.  But the point is that among the other

4   collateral consequences are the fact that somehow word got out

5   from San Francisco to the Maryland State Troopers that

6   Ms. Esposito had invoked her marital privilege.

7        Your Honor, at this point I do believe Mr. Bridges would

8   like to be heard.  Thank you.

9        **THE COURT:**  Very well.

10       Mr. Bridges.

11       **THE DEFENDANT:**  Do pardon me, Your Honor, because,

12  obviously, I did not prepare a statement, as I was not planning

13  on speaking today.  But I did want to share a few things.

14       I obviously have lost a lot.  I had a very illustrious

15  career, graduated top of my class from the state police, top of

16  my class from the Secret Service.  Not too many people can say

17  the governor is willing to write a letter on their behalf.

18       So I'm very proud, at least of my past before this, this

19  moment that I'm here before you today for.  I've lost a lot.

20  I've accepted responsibility.  And I don't deny that and I

21  don't diminish any fact of that.  I expect you to give me a

22  likely period of incarceration.

23       My wife lost her employment.  I gave up an illustrious

24  career.  I owe all this money.  Though I never spent a penny of

25  it, I have to pay back money to the Department of Justice that

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 69 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 61 of 80

61

1    I paid, for taxes to the state of Maryland.  There's two

2    different departments.  So I owe more money, technically, than

3    I've even taken.

4         I just want to at least address, for your own

5    clarification, just a few issues that the government brought

6    up.

7         This entire investigation began when I was notified about

8    criminal activity of Carl Force.  An international coin

9    exchange contacted me, personally notified me about

10   Carl Force's criminal activity.

11        Within two hours of being notified I had elevated it

12   through the chain of command and reported it and instructed

13   this foreign institution to file what's referred to as a

14   "Suspicious Activity Report" on Carl Force.  That is what began

15   this entire investigation.

16        Within the coming days, Ms. Haun called me at my personal

17   residence to discuss the report that was filed on Carl Force.

18   And that is what ended up leading to my own downfall.  Knowing

19   such, I had lived with this burden for two years.  I could

20   never spend any of it.  I knew when I turned in Carl Force that

21   it would ultimately lead to me.  I mean, the person turning him

22   worked with him; they're obviously going to look at me.  But I

23   accept that.  I don't diminish one bit of it here.

24        I just want to also address the Mt. Gox issue, since you

25   just brought that up with them.  The government knows this.

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 70 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 62 of 80

62

1   I've turned over an email to them.  I was assigned that seizure

2   within a week of doing that seizure.  And Mt. Gox did

3   approximately a hundred million dollars a month.  Their

4   business didn't cease operation after that seizure.

5       And the only reason I say that is, again, not in any form

6   to diminish my actions, but the allegation that it was somehow

7   timed, the money could be have been withdrawn after the

8   seizure.

9       I mean, it didn't affect their operation.  They moved a

10  hundred million dollars a month and we seized two million.

11      But I wanted to be clear that I accept full

12  responsibility.

13      I think the people that flew all the way here from

14  Baltimore to speak on my behalf, Ms. Golden and my wife, who

15  is -- she's lost everything.  She went to college to be in law

16  enforcement and now she's lost it all.

17      Again, I didn't have anything prepared, but I at least

18  wanted to apologize to everybody.

19      Thank you.

20      THE COURT:  Thank you.

21      Mr. Levin, anything further?

22      MR. LEVIN:  Nothing further, Your Honor.

23      THE COURT:  All right.

24      MR. LEVIN:  Should we have a seat or --

25      THE COURT:  Yes, you may.

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 71 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 63 of 80

63

1          Anything further?

2          **MS. HAUN:**  Your Honor, very quickly, just for the record.

3    Because we are creating a record, Mr. Evans and I, we can

4    respond to a number of things.  We won't.  I know we're running

5    short on time.

6          Just three brief things.

7          One, the understanding Mr. Levin had about the

8    investigation into Carl Force started coming from Mr. Bridges.

9    That's not correct.  I'm not going to get into, in open court,

10   how our investigation began, but it was not -- it was but for

11   Mr. Bridges, not because of Mr. Bridges.

12         The second thing we just wanted to clarify about,

13   Mr. Levin commented about putting into context, and he read a

14   text message.  That's one of dozens and dozens of text

15   messages.  And I want the Court to know that we've been fully

16   forth- --

17         **THE COURT:**  This is a point about Mr. Green?

18         **MS. HAUN:**  Yes.  And we've been fully forthcoming with

19   the Court, and you heard from Mr. Green himself, there were a

20   number of other text messages that Russ Ulbricht sent with his

21   employees of the Silk Road -- and not just Force -- after the

22   message that you heard from today.

23         So we do believe that one of the primary reasons -- and

24   we continue to believe one of the primary reasons that there

25   was a hit put out for Mr. Green was because of Mr. Bridges's

1    conduct.

2         And finally, Your Honor, we heard from Mr. Levin that

3    Mr. Bridges tried to cooperate with the government, he came

4    fully clean, he told us everything.

5         Your Honor, there were about six federal agents and three

6    federal prosecutors and he tried to tell us that actually he

7    didn't steal Mr. Green's money or that 21,000 bitcoins, he only

8    stole part of it.  He actually -- I won't tell you who he said

9    stole the first couple of transactions, but he actually said --

10   and he might even continue today to sit here and tell you --

11   that he didn't make the first two transfers out of Mr. Green's

12   account and that someone else did those.  And he blamed another

13   individual for those.

14        So for him to say that he cooperated with the government

15   in this proffer session, Your Honor, the government feels quite

16   differently about whether or not he was forthcoming, and we

17   certainly don't think he cooperated in the investigation.

18        And we just wanted to make those points for the record.

19        And I think that's -- that covered it.

20        **MR. EVANS:**  Just the fact that it was not a cooperation

21   agreement, Your Honor; it was a straight-up employment.

22        **THE COURT:**  I understand.  Very well.

23        Applying the factors that are set forth under 18 USC

24   3553(a), this is the point where the statute directs me to

25   determine a sentence which is sufficient but not greater than

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 73 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 65 of 80

65

1    necessary.  This, to me, is an extremely serious crime

2    consisting of the betrayal of public trust by a federal law

3    enforcement agent.  And from everything I see, it was motivated

4    entirely by greed.

5         Mr. Bridges engaged in what I think is a sophisticated,

6    thought-out scheme in which he stole substantial sums of money.

7    And he attempted to cover his tracks, which in one of the most

8    significant factors to me -- and I appreciate Mr. Green having

9    come forward -- as I said before, it is inexcusable for a

10   federal agent to put a cooperating witness at risk in the

11   fashion that was done here.  Whether or not there was actual

12   threats that emanated from it, to me, that's not the central

13   point.  The central point, again, is the extraordinary betrayal

14   of public trust that could -- could very possibly have gotten a

15   person killed.

16        I think in the interest of deterrence, both general

17   deterrence and as to Mr. Bridges as an individual, and to

18   promote respect for law, no departure or variance is warranted

19   in this case.

20        Now, I acknowledge Mr. Bridges's earlier years of service

21   with law enforcement, but nothing in that background I think

22   excuses or mitigates what is to me a shocking and reprehensible

23   abandonment of his public duty.  And I similarly find the

24   references in Dr. Bloomberg's report to alcohol issues and

25   depression issues simply unconvincing, in this context, as a

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 74 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 66 of 80

66

1    mitigating factor.  I seldom find myself in the position of

2    imposing a high-end guideline sentence, but I think it is

3    required in this case.

4         Any legal reason why sentence may not be imposed at this

5    time?

6         MR. EVANS:   No, Your Honor.

7         MR. LEVIN:   No, Your Honor.

8         THE COURT:   Pursuant to the Sentencing Reform Act of

9    1984, it is the judgment of the Court that Shaun Bridges is

10   hereby committed to the custody of the Bureau of Prisons to be

11   imprisoned for a term of 71 months.

12        This term consists of terms of 71 months on Counts 1 and

13   2, all counts to be served concurrently.

14        The Court recommends that the defendant participate in

15   the Bureau of Prisons' Residential Drug Abuse Treatment

16   Program.

17        Upon release from imprisonment, the defendant shall be

18   placed on supervised release for a term of three years.  This

19   term consists of terms of three years on each of Counts 1 and

20   2, all such terms to run concurrently.

21        Within 72 hours of release from the custody of the Bureau

22   of Prisons, the defendant shall report in person to the

23   probation office in the district to which the defendant is

24   released.

25        While on supervised release, the defendant shall not

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 75 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 67 of 80

67

1    commit another federal, state, or local crime, shall comply

2    with the standard conditions that have been adopted by this

3    Court, shall refrain from any unlawful use of a controlled

4    substance and submit to a drug test within 15 days of release,

5    on supervised release, and two periodic drug tests thereafter,

6    and shall comply with the following conditions:  One, the

7    defendant shall participate in a program of testing and

8    treatment for alcohol abuse as directed by a probation officer

9    until such time as the defendant is released from treatment by

10   the probation officer.

11        The defendant is to pay part or all of the cost of this

12   treatment in an amount not to exceed the cost of treatment as

13   deemed appropriate by the probation officer.

14        Payment shall never exceed the total cost of urinalysis

15   and counseling.  The actual copayment schedule shall be

16   determined by the probation officer.

17        Two, the defendant shall abstain from the use of all

18   alcoholic beverages.

19        Three, the defendant shall pay any special assessment

20   that is imposed by this judgment and that remains unpaid at the

21   commencement of the term of supervised release.

22        Four, the defendant shall provide the probation officer

23   with access to any financial information, including tax

24   returns, and shall authorize the probation officer to conduct

25   credit checks and obtain copies of income tax returns.

1          Five, the defendant shall submit his person, residence,

2     office, vehicle, or any property under his control to a search.

3     Such a search shall be conducted by a United States Probation

4     Officer at a reasonable time and in any reasonable matter based

5     upon reasonable suspicion of contraband or evidence of a

6     violation of a condition of release.  Failure to submit to such

7     a search may be grounds for revocation.

8          The defendant shall warn any residents the premises shall

9     be subject to searches.

10         Six, the defendant shall not have any contact with any

11    co-defendant in this case, namely, Carl Mark Force IV.

12         Seven, the defendant shall cooperate in the collection of

13    DNA as directed by the probation officer.

14         Eight, the defendant shall not own or possess any

15    firearms, ammunition, destructive devices, or other dangerous

16    weapons.

17         It is further ordered the defendant shall pay to the

18    United States a special assessment of $200, which shall be due

19    immediately.

20         When incarcerated, payment of criminal monetary penalties

21    are due during imprisonment at the rate of not less than $25

22    per quarter, and payments shall be through the Bureau of

23    Prisons' Inmate Financial Responsibility Program.

24         Criminal monetary payment shall be mailed to the clerk of

25    the US District Court, 450 Golden Gate Avenue, Box 36060,

1    San Francisco, California, 94102.

2         The defendant's interest in the following property shall

3    be forfeited to the United States.

4         The defendant's interest in the property to be forfeited

5    is $165,529.88 from Fidelity brokerage account held in the name

6    of Quantum Investments, 306,000 held in trust in the attorney

7    of record's name, $4,745.92 from PNC bank account, jointly-held

8    in the name of Shaun Bridges and a person known to the parties,

9    and 651,000 monetary judgment.

10        I do find that the defendant does not have the financial

11   resources to pay a fine and order that the fine be waived.

12        The next question that we need to address is the

13   surrender question.  What's the government's position?

14        MR. EVANS:  Your Honor, given the length of the custodial

15   sentence that the defendant has just been sentenced to, the

16   government moves to have the defendant remanded into custody at

17   this time.  The government does not doubt that Mr. Bridges, at

18   this point in time, is suffering from depression, as his

19   physician has indicated; he's also indicated there's issues

20   with alcohol and so forth and those are factors to be

21   considered in terms of public safety and safety of the

22   defendant himself.

23        We think that those issues are taken away, taken off the

24   table, if the defendant is remanded into custody at this point

25   in time.

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 78 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 70 of 80

70

1      Just in terms of -- the Court made reference earlier --

2      and I think it was discussed earlier about, you know, the fact

3      that he, Mr. Bridges -- when he went in to make a police

4      report, he didn't, in fact, file a police report.  He indicated

5      at that point in time that he just wanted a case number, and

6      didn't, in fact, want to file a police report.

7      So there are certain issues that go with -- whether it's

8      changing the Social Security number on the name, all these

9      things the Court has heard before which give the government

10     continued concern about his possible intention to flee and

11     possible safety risk to himself and the community.

12     We think all those things mitigate toward remanding the

13     defendant into custody at this point in time.

14     **THE COURT:**  The second issue that arose in the pretrial

15     release context involved trying to get some Maryland State

16     Police records.  Whatever happened with that?  I know there

17     were proceedings in front of the magistrate judge, I believe

18     in -- initially, in Baltimore, and then video conference with

19     Judge -- I guess it was James here.

20     **MR. EVANS:**  There was an audio conference or a hearing

21     held by the magistrate judge out here in San Francisco,

22     Your Honor, in which the judge increased the defendant's

23     presentencing confinement or presentencing release conditions

24     in which he additionally instructed or placed him on home

25     confinement and restricted him to any access to computers and

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 79 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 71 of 80

71

1    prevented him from actually leaving his home other than to meet

2    with his attorney.

3        THE COURT:  In terms of assessing whether or not

4    Mr. Bridges is either a flight risk or a danger to himself,

5    not, I don't think, danger to others, is really implicated

6    here.  Why are those incidents indicative of something that I

7    should take into account?  Why do they cause you -- I

8    understand your point that he now -- Mr. Bridges knows the

9    significant sentence that he does indeed face, and that is

10   certainly something to take into account.  And some of the

11   issues that you mentioned before with respect to mental

12   health/alcohol issues.

13       But the pretrial release problems, if you will, that he

14   had, why are those indicative of a greater flight risk?

15       MR. EVANS:  Your Honor, the point I'm trying to make in

16   that is the fact that the government has sought his detention

17   for some time now, since back in, I think, July.

18       THE COURT:  Well, I understand that, but what I'm trying

19   to get at is -- I know that was the position you took, but is

20   that because you thought these -- this activity was in the

21   process of trying to get identity to leave the country or --

22       MR. EVANS:  Yes, Your Honor.  We thought that those

23   things could be connected with possible intentions to flee the

24   jurisdiction:  Trying to obtain a new Social Security number, a

25   new name; trying to have those shielded from law enforcement

1   and the courts.

2       We thought those were indications of possible attempts to

3   obtain additional or alternate identities or identifications

4   where he could then flee the jurisdiction.  We think that,

5   again, this is one of those cases where defendant has complied

6   with the restrictions placed on him by the Court; however, the

7   sentence has now been handed down, it is a lengthy prison

8   sentence that defendant is looking at at this point in time.

9   And because of those concerns, ongoing concerns, that the

10  government has had since this summer about possible attempts to

11  flee -- as well as the latest revelations about his mental

12  state and his abuse of alcohol -- we think that all of those

13  issues point toward remanding the defendant into custody at

14  this point in time, and the onus is on Defendant at this point

15  in time to show why --

16      **THE COURT:**  Mr. Bridges has known -- by virtue of his own

17  counsel's sentencing brief, he's known he's going to face a

18  substantial sentence.  And so the -- the defense position was

19  not less than 36 months.

20      So he's had it in mind that that's out there, that that

21  was -- I think -- I suspect he walked in today with the

22  understanding that a custodial sentence was going to be imposed

23  and yet he's made his court appearances, he's shown up.

24      So the fact that perhaps it is a longer sentence than he

25  has hoped to receive --

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 81 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 73 of 80

73

1      MR. EVANS:  I think it's significantly longer,

2   Your Honor.  I think the defendant was asking for 36 months,

3   and it's almost double that.  So we're looking at a significant

4   period of time.  Almost six years.

5      And for that reason, Your Honor, I think maybe the

6   calculus changes in defendant's mind.  But the government's

7   position has consistently been that release is not appropriate

8   in this case.

9      And now that he's been sentenced to 71 months

10  incarceration, the government feels more strongly than ever

11  that defendant should be remanded into custody at this point in

12  time, as opposed to allowed to self-surrender.

13      THE COURT:  Mr. Levin.

14      MR. LEVIN:  Thank you, Your Honor.  Mr. Bridges has

15  complied with all the terms and conditions of his pretrial

16  release.  He's been at every court appearance he's been told to

17  appear for.  The fact that he received a guideline sentence,

18  frankly, I think Mr. Bridges expected a guideline sentence.  I

19  think to some degree there's a relief now that it's behind him

20  and he can move forward by serving his sentence.

21      The fact that there was a -- that he has suffered from an

22  alcohol abuse problem, he sought counseling for that and has

23  been alcohol-free for -- I think 40 weeks, if I'm not

24  mistaken -- because he sought treatment for his alcohol

25  problem.  And now he has been locked down in his home and

1    there's no indication that his alcohol abuse has created an

2    issue while on pretrial release, Your Honor.

3        A couple of other points, if I may.  We're going to be

4    asking that Mr. Bridges be designated to a Bureau of Prisons

5    facility in Maryland.  FCI in Cumberland, specifically.  The

6    transfer from California to Maryland, when that occurs, while

7    we're waiting for that to occur, Mr. Bridges will no doubt be

8    in solitary confinement.  The transfer itself is a horrendous

9    ordeal, as I'm sure Your Honor is aware.  There's cost, also,

10   involved.  And while it may be minimum in the grand scheme of

11   government cost, it's still a cost that the government wouldn't

12   otherwise have to have borne, and -- or bear out.

13       So there's every reason to believe -- and Mr. Bridges has

14   strong support from his wife.  His mother-in-law is also here.

15   His former supervisor is here.  These are all people

16   Mr. Bridges knows he can rely on when he eventually gets out of

17   confinement.

18       But the fact is that he has complied with his conditions

19   and --

20       THE COURT:  Well, I suppose my bigger concern right now

21   is just you have -- doing your job, have presented to me some

22   issues of concern about his mental health, and also I now

23   appreciate your comments about the alcohol issue.

24       But that's -- it's -- I will be the first to acknowledge,

25   a big sword hanging over him at the moment, that he is going to

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 83 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 75 of 80

75

1   have to report to prison.  And I have some genuine concern

2   that -- you know, that that's perhaps going to be too much

3   to -- for him to deal with.

4        And so that's where my question is coming from.  If

5   you -- you've probably already addressed it, to the extent you

6   can.  But the issue of in the interim time period should he be

7   allowed to self-surrender, to have a confidence level that, at

8   the very least, there's not going to be any attempt to leave

9   the jurisdiction, but just is he in a mental position to be

10  able to tolerate this?

11       MR. LEVIN:  It's a fair question, Your Honor.  Two

12  responses.  First, I believe the statute says to consider

13  whether or not Mr. Bridges is a flight risk or a danger to the

14  community.

15       THE COURT:  True.

16       MR. LEVIN:  Not a danger to himself.

17       THE COURT:  Well, I guess the statute may not say that,

18  but I am concerned if people are a danger to themselves.  And I

19  don't know if the statute specifically lets me take that into

20  account, but I've got to tell you I do take that into account.

21       MR. LEVIN:  And that's why there's a second point,

22  Your Honor.  Dr. Bloomberg stated that he believed

23  Mr. Bridges's prognosis is excellent, and he indicated that

24  Mr. Bridges has indicated no suicidal ideations.  As I said,

25  for the two years between the theft and the charging, this

1   case -- the potential for a case like this hung over him -- I

2   believe I wrote -- like a sword of Damocles.

3        I think that is a bigger sword than the sword now facing

4   him, in terms of reporting to prison.  He knows for certainty

5   what he's going to get.  He knows that he might be eligible for

6   RDAP, which will help him.  He has every reason to behave and

7   earn good-time credit.  These are all things that Mr. Bridges

8   anticipates and wants to take advantage of certain programs.

9        As I said, I think Mr. Bridges, in some respect, is

10  relieved to finally have this day over with and he can then

11  prepare for serving his sentence, Your Honor.

12       MR. EVANS:  Your Honor, if I can just respond and remind

13  the Court that the statute uses the language "shall" in terms

14  of remand, absent extraordinary circumstances.  And given the

15  diagnosis of Dr. Bloomberg of a specified personality disorder,

16  insecure schizoid, impulse features and so forth, we're

17  concerned that that diagnosis is out there.

18       And again, because of the statute using the language

19  "shall" except in extraordinary circumstances, we don't believe

20  this is one of those cases that it falls into that category and

21  we think that it's best for the defendant and for general

22  public that he be remanded in custody.

23       And I will point out that the government's paying for his

24  transportation and stay out here regardless, as the Court has

25  granted motions for him to do that.  So whether he's

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 85 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 77 of 80

77

1    transported back by the marshal's service or he flies back, the

2    government is bearing the cost, Your Honor.

3        MR. LEVIN:   The government does not pay for Mr. Bridges's

4    return to Maryland, Your Honor.   That was clear in Your Honor's

5    order.

6        THE COURT:   I authorized his one-way travel here.

7        MR. EVANS:   I apologize, Your Honor.

8        THE COURT:   Okay.  All right.

9        Is the matter submitted?

10        MR. EVANS:   Yes, Your Honor.

11        MR. LEVIN:   Yes, Your Honor.  Thank you.

12        THE COURT:   I will allow Mr. Bridges to self-surrender.

13    Self-surrender also carries some significance in terms of, as I

14    understand it, Bureau of Prisons.  But it's a very close call

15    because I am -- I am troubled, I am concerned by the pretrial

16    conduct which struck me as -- if not indicative of flight, just

17    quite odd, and caused me concern.

18        So, as I say, it's a close call.  But I am willing to

19    allow him to do that.  I will make the recommendation for the

20    facility in Maryland.

21        But I want a short self-surrender date.  So I know they

22    may not have designated at the time that he surrenders, but he

23    nonetheless has to surrender.  So I'm looking for something in

24    January.  Do you have a suggestion for me?

25        MR. LEVIN:   I have to look at what day of the week, but I

1    would ask for January 30th, Your Honor.

2         THE COURT:  Well --

3         THE CLERK:  That's a Saturday.

4         MR. LEVIN:  January 29th, Your Honor.

5         THE COURT:  All right.  And he would then surrender -- if

6    there's no designation at that time, he would have to

7    surrender, I believe, to the marshals in Baltimore?  Is that

8    where he would go?

9         MR. LEVIN:  That's correct, Your Honor.  Based on my

10   experience, that's correct.

11        THE COURT:  I think you're right.  All right.

12        MR. LEVIN:  Thank you, Your Honor.  We would ask for --

13   Mr. Bridges did serve -- between the time he was detained until

14   he was released after the hearing, back in Baltimore, he

15   served, I believe, five days.  We'd ask for five days' credit.

16        THE COURT:  I think that is a function of -- I don't

17   usually order that.  It's whatever the Bureau of Prisons

18   applies or doesn't.  And then, if there's an issue, I suppose

19   you can bring it up.  But I don't generally order that certain

20   time is credited or not.  I leave that for the Bureau of

21   Prisons to calculate.

22        MR. LEVIN:  I just wanted to have it on the record that

23   it was five days, if anyone looks at it.

24        THE COURT:  All right.

25        MR. LEVIN:  Thank you.

Case: 15-10590, 08/05/2016, ID: 10077274, DktEntry: 23-1, Page 87 of 129
Case 3:15-cr-00319-RS   Document 109   Filed 01/14/16   Page 79 of 80

79

1      THE COURT:  Mr. Bridges, under paragraphs 4 and 5 of your

2   plea agreement it indicates that you have given up the bulk of

3   your appellate rights, with some of the limited exception

4   pertaining to the entry of the plea and ineffective assistance.

5      Not suggesting one way or the other if you have any

6   appellate rights remaining, if you do wish to file a notice of

7   appeal you need to do that 14 days from the entry of judgment.

8      You understand that?

9      THE DEFENDANT:  Yes, sir.

10      THE COURT:  All right.  Very well.

11      MR. LEVIN:  Thank you, Your Honor.

12      MS. HAUN:  Thank you, Your Honor.

13      (Proceedings adjourned at 1:02 P.M.)

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF CONTRACT REPORTER

I, Kelly Lee Polvi, certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 14th day of January, 2016.

_____
Kelly Lee Polvi
CA CSR No. 6389
Registered Merit Reporter
Federal Certified Realtime Reporter

*Kelly Polvi, CSR, RMR, FCRR*
*P.O.  Box 1427*
*Alameda, CA 94501*
*503.779.7406; kpolvi@comcast.net*

Pages  1  —  39

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 15—319 RS |
| | ) | |
| SHAUN W. BRIDGES, | ) | |
| | ) | San Francisco, California |
| Defendant. | ) | Wednesday |
| | ) | August 31, 2015 |
| | ) | 3:31 p.m. |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:            MELINDA HAAG
                         United States Attorney
                         450 Golden Gate Avenue
                         San Francisco, California   94102
                  BY:    KATHRYN R. HAUN
                         WILLIAM FRENTZEN
                         Assistant United States Attorneys
                         and
                         UNITED STATES DEPARTMENT OF JUSTICE
                         Criminal Division, Public
                            Integrity Section
                         1400 New York Avenue N.W.
                         12th Floor
                         Washington, D.C.   20005
                  BY:    RICHARD B. EVANS, ESQ.


Reported by:             BELLE BALL, CSR #8785, CRR, RDR
                         Official Reporter, U.S. District Court


(Appearances continued, next page)

```
APPEARANCES, CONTINUED:


For Defendant:            LEVIN AND CURLETT LLC
                          201 North Charles Street.
                          Suite 2000
                          Baltimore, Maryland  21201
                     BY:  STEVEN H. LEVIN, ESQ.
                          and
                          SNELL AND WILMER
                          50 West Liberty Street
                          Suite 510
                          Reno, Nevada  89501
                     BY:  CRAIG DENNEY, ESQ.


Also Present:             BRAD T. WILSON,
                          U.S. Pretrial Services Officer
```

```
1    MONDAY, AUGUST 31, 2015                          3:03 P.M.

2                        P R O C E E D I N G S

3         THE CLERK:  Calling Criminal Case No. 15-319, United

4    States versus Shaun Bridges.  Please step forward and state

5    your appearances.

6         MS. HAUN:  Good afternoon, Your Honor.  Kathryn Haun

7    for the United States.  I'm joined by my colleagues Mr. William

8    Frentzen from my office, and also Richard Evans from the Public

9    Integrity Section of the Department.

10        THE COURT:  Good afternoon.

11        MR. FRENTZEN:  Good afternoon, Your Honor.

12        MR. LEVIN:  Good afternoon, Your Honor.  Steven Levin

13   on behalf of Mr. Bridges, who is standing to my right.

14        THE COURT:  Good afternoon.

15        MR. DENNEY:  Craig Denney, Your Honor.

16        THE COURT:  Good afternoon.  This matter is on my

17   calendar for, my understanding is, the entry of a plea.  Is

18   that correct?

19        MS. HAUN:  That's correct, Your Honor.  And the

20   parties lodged some time ago the executed plea agreement.  And

21   there have been no changes since we lodged that with the Court.

22        THE COURT:  Okay, very good.

23        MS. HAUN:  And if the Court is all right with it

24   today, I propose, since I represented the government in the

25   Force entry of plea, I would like to ask for the Court's
```

1   permission today for my colleague Mr. Evans from the Public

2   Integrity section, if it's all right with the Court, for him to

3   handle some of the elements and the factual basis.

4            **THE COURT:**  Sure.  That's fine with me.

5            **MS. HAUN:**  Thanks.

6            **THE COURT:**  Mr. Bridges, my understanding is that you

7   are prepared to enter a plea this afternoon.  Is that how you

8   would like to proceed, sir?

9            **THE DEFENDANT:**  Yes, Your Honor.

10           **THE COURT:**  All right.  I'm going to ask my courtroom

11   deputy to put you under oath at this time.

12       (Defendant placed under oath)

13           **THE COURT:**  Mr. Bridges, you are now under oath.  I'm

14   going to be asking you some questions.  You need to answer my

15   questions truthfully.  In the event that you were to fail to

16   answer my questions truthfully, you could face charges in

17   addition to those that are the subject of our discussion this

18   afternoon.

19       Do you understand that?

20           **THE DEFENDANT:**  I understand.

21           **THE COURT:**  Okay.  What is your full name, sir?

22           **THE DEFENDANT:**  Shaun Wesley Bridges.

23           **THE COURT:**  Okay.  And how old are you, Mr. Bridges?

24           **THE DEFENDANT:**  Thirty-three.

25           **THE COURT:**  Okay.  What was the highest grade level

1  you reached in school?

2        THE DEFENDANT:  Sixteenth.

3        THE COURT:  Okay.  You have been represented by

4  counsel in this case.  And, counsel's appearance was on the

5  record, but let me mention their names again.  It's Mr. Evans?

6        MR. LEVIN:  Steve Levin, Your Honor.

7        THE COURT:  Mr. Levin, excuse me.  And then

8  apparently other counsel.  Have you been satisfied with the

9  representation that you have received in the case?

10       THE DEFENDANT:  I have, Your Honor.

11       THE COURT:  All right.  Now, in the last 24 hours

12 have you had occasion to take any prescription medication, any

13 drugs, or alcohol, that would affect your ability to understand

14 our discussion here this afternoon?

15       THE DEFENDANT:  No, sir.

16       THE COURT:  Now, I have been handed a plea

17 agreement -- provided with it, actually, in advance -- and it

18 has various signatures on it, one of which indicates that it's

19 your signature.

20    Is that your signature (Indicating), Mr. Bridges?

21       THE DEFENDANT:  That is, sir.

22       THE COURT:  All right.  And did you have an

23 opportunity to review this plea agreement?

24       THE DEFENDANT:  I did.

25       THE COURT:  Did you have an opportunity to discuss it

1  with your counsel?

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  Now, are all of the understandings that

4  you have with the government that are prompting you to proceed

5  by way of a plea this afternoon, are they all contained in this

6  written document?

7           THE DEFENDANT:  They are, sir.

8           THE COURT:  Okay.  In other words, what I want to

9  confirm is as far as you know, there are no side agreements or

10  oral understandings.

11          THE DEFENDANT:  Correct.

12          THE COURT:  Okay.  Has anyone threatened or coerced

13  you in any way to enter a guilty plea this afternoon?

14          THE DEFENDANT:  No, sir.

15          THE COURT:  This is your voluntary decision to

16  proceed this way?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  This particular plea agreement is entered

19  into under a rule we refer to as Rule 11(c)(1)(A) and

20  11(c)(1)(B).  Under the provisions of that rule, this plea

21  agreement contains various recommendations to me as to how I

22  should assess and what sentence I should impose.

23      Do you understand that?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  And do you also understand that these are

1   simply recommendations, and that it will be for me to decide

2   what the appropriate sentence is?

3             **THE DEFENDANT:**  I do, sir.

4             **THE COURT:**   Okay.  And that sentence can, under the

5   law, go up to the statutory maximum of the charges, the

6   particular statutes under which you are charged.

7        And in this instance, you are charged in Counts 1 and 2 of

8   the information that is the subject of our discussion today

9   with money laundering in violation of Title 18, United States

10  Code Section 1957, and with obstruction of justice in violation

11  of Title 18, United States Code Section 1512(c)(2).

12       On that first count, the money-laundering count, the

13  maximum prison term you could receive in the event of

14  conviction is 20 years imprisonment; a $250,000 fine; or twice

15  the gross gain or loss, whichever is greater; a three-year term

16  of supervised release; restitution to be determined; a $100

17  mandatory special assessment; and forfeiture, as appropriate.

18       Under Count 2, which is the obstruction-of-justice count,

19  again, the maximum penalty could you receive in the event of

20  conviction would be 20 years imprisonment; $250,000 fine;

21  three-year term of supervised release; restitution, to be

22  determined; $100 mandatory special assessment; and forfeiture,

23  as appropriate.

24       Do you understand that your sentence, under the law, that

25  I can impose could be up to that maximum on each of those

1  counts?

2          THE DEFENDANT:  I do, sir.

3          THE COURT:  All right.  Now in this plea agreement,

4  in particular in Paragraphs 4 and 5, it indicates the language

5  of the agreement is that you are giving up various of your --

6  the bulk of your appellate rights.

7      In Paragraph 4 you are giving up what's called your direct

8  rights to appeal.  And then in Paragraph 5 it indicates you are

9  giving up your collateral appellate rights, sometimes referred

10  to as "habeas" rights, with the exception that you reserve the

11  right to claim ineffective assistance of counsel in connection

12  with negotiating this plea agreement and the entry of your

13  guilty plea.

14      Do you understand that under the terms of the plea

15  agreement, that is what it indicates, that you are giving up

16  those appellate rights?

17          THE DEFENDANT:  I do, sir.

18          THE COURT:  Now, in this case, you have a right to

19  maintain a not-guilty plea.  You have a right to proceed to

20  trial in the case.  At that trial, you would have the right to

21  be represented by counsel.  Your counsel would have an

22  opportunity to call witnesses to testify in your behalf, and

23  cross-examine any witnesses the government calls -- would call

24  to testify against you.

25      At that trial, you would have a right to testify.  At the

```
 1   same time, you could elect not to testify.  And if you made

 2   that decision, the government would be precluded from making

 3   any reference to the fact that you had made that decision.

 4       The case would then be submitted to a jury of 12

 5   individuals.  And in order for you to be found guilty, all 12

 6   would have to conclude that the government had proven your

 7   guilt beyond a reasonable doubt.  And then, if you are

 8   convicted, you would have a right to appeal and a right to be

 9   represented in that process.

10       If you enter your guilty plea today, you will be giving up

11   all those rights.  Do you understand that?

12           THE DEFENDANT:  I do sir.

13           THE COURT:  Very well.  Again, Mister --

14           MR. FRENTZEN:  Evans, Your Honor.

15           THE COURT:  Mr. Evans, if you could review for us the

16   elements of the charges that the government would be prepared

17   to prove, and also the factual basis that the government would

18   be prepared to present.

19           MR. EVANS:  Yes, Your Honor.  Should this -- the

20   elements of the first count, Count 1, 18 U.S.C., Section 1957,

21   money laundering, the elements are as follows:  That the

22   Defendant knowingly engaged or attempted to engage in a

23   monetary transaction.

24       Two, that he knew the transaction involved

25   criminally-derived property.
```

1    Three, that the property had a value greater than $10,000.

2    Four, the property was in fact derived from wire fraud.

3    And five, that the transaction occurred within the United

4    States.

5    Wire fraud being the underlying -- the SUA for this

6    particular money-laundering count.  And the elements of wire

7    fraud are that:  The Defendant knowingly devised a scheme or

8    plan to defraud or to obtain money or property by means of

9    false or fraudulent pretenses, representations or promises.

10    Two, that the statements made or facts omitted were

11    material.

12    And three, that he acted with intent to defraud, and that

13    is the intent to deceive or cheat.

14    And four, that he used or caused to be used an interstate

15    wire communication to carry out or attempt to carry out an

16    essential part of that scheme.

17    In terms of Count 2 the obstruction count, a violation of

18    18 U.S.C. Section 1512(c)(2), the elements are that the

19    Defendant obstructed, influenced or impeded an official

20    proceeding.  And two, that he did so -- in doing so, he acted

21    corruptly.

22    And there are, in fact, two official proceedings of which

23    the factual basis address.  And I'll go through those at this

24    point.

25    Your Honor, in terms of the money laundering and the

1  obstruction, the factual basis agreed to by the parties as

2  reflected in the plea agreement indicates that on or about

3  January 25, 2013, the Defendant devised a scheme to defraud and

4  obtain money and property through false and fictitious

5  representations, in that he used an administrator account on

6  the Silk Road website belonging to another individual, and not

7  intended for his personal use, to gain access to that site.

8      Once he had gained access to that Silk Road website, he

9  used the information to change passwords and PINs on various

10  accounts and to move approximately 20,000 Bitcoins from various

11  Silk Road vendor accounts into a wallet, which he exercised

12  control.  And the value of those Bitcoin at that time was

13  approximately $350,000.

14      And that on or about January 26, 2013, he moved that

15  Bitcoin into an account at Mt. Gox, which is a digital currency

16  exchange based in Japan.

17      Subsequently, on October 27, 2013 (sic), he attempted to

18  lull the manager of the Silk Road website -- that's William

19  Ross -- Ross William Ulbricht, also known as "Dread Pirate

20  Roberts" -- by telling them that the Bitcoin actually had been

21  stolen from him.

22      And that that communication, the government if this had

23  gone to trial could prove took place when Mr. Ulbricht was in

24  the Northern District of California on that date, when the

25  Defendant was in Maryland at the time.

1      Now, subsequently to that, Your Honor, the United States

2  would prove and the parties have agreed to in the factual basis

3  that between March and May of 2013, the Defendant converted the

4  Bitcoin into U.S. currency and caused wire transfers of the

5  money totaling approximately $820,000 at the time from the

6  accounts at Mt. Gox into a Quantum International Investments,

7  LLC account at Fidelity in the United States.

8      And subsequently, that on June 2nd, 2014, the Defendant

9  transferred funds from that Quantum Fidelity account into an

10 account in the joint names of himself and one other individual.

11     Your Honor, the factual basis lists the specific wires,

12 the dates of those wires, and the amounts on Page 4 of the plea

13 agreement.  And the parties have agreed, stipulated in the

14 factual basis part of the plea agreement that the funds in

15 these transactions were proceeds of wire fraud.  And that the

16 Defendant carried out each of these transactions with the

17 intent to promote an ongoing wire fraud scheme, and to conceal

18 and disguise the nature, the location, the source, ownership,

19 and origin of these illegal proceeds.

20     Now, during this time, Your Honor, that the Defendant

21 devised and carried out this fraud money-laundering scheme, he

22 was a Special Agent of the United States Secret Service, and a

23 member of the Electronic Crimes Task Force of the Baltimore

24 Silk Road Task Force.  And was actively engaged in

25 investigating the Silk Road, its vendors, buyers, as well as

1   Dread Pirate Roberts, for which there was an ongoing grand jury

2   investigation in the District of Maryland.  And, the Defendant

3   has agreed that the Baltimore Silk Road grand jury

4   investigation was, in fact, an official proceeding.

5        Now, the Defendant, as a Secret Service Special Agent,

6   held a position of trust.  And he abused that trust, abused

7   that position.

8        Defendant in the factual basis further agrees that his

9   activities obstructed, influenced, and impeded the grand jury

10  -- the Baltimore grand jury investigation into the Silk Road,

11  as well as resulting in the case of Maryland -- excuse me -- in

12  the District of Maryland against Ulbricht, among other things,

13  obstructing and impeding the ability of the investigation to

14  fully utilize the corroborators' access to the Silk Road after

15  the Defendant's fraud, causing the task force and the grand

16  jury to spend time and effort to investigate the thefts of the

17  Silk Road that he committed, creating additional incentive for

18  Mr. Ulbricht to attempt to hire someone to kill a cooperator

19  whom Mr. Ulbricht suspected of committing the thefts that in

20  fact he had committed.  And finally, obstructing and

21  influencing and impeding the grand jury's investigation of or

22  into Ulbricht in the District of Maryland.

23       Your Honor, the factual basis also agreed to by the

24  parties indicates that as of May of 2014, there was an active

25  San Francisco-based grand jury investigation into the potential

1   misconduct of a Drug Enforcement Administration agent, DEA

2   agent by the name of Carl Mark Force.  And that that

3   San Francisco grand jury subsequently began to investigate the

4   Defendant's misconduct.

5        On or about May 28, 2014, the Defendant was interviewed by

6   Special Agent with the FBI, and intentionally misled that agent

7   as part of the San Francisco-based grand jury investigation.

8        Additionally, on November 13, 2014, he was again

9   interviewed by a Special Agent from the Department of Justice,

10  Office of Inspector General, and he intentionally misled that

11  agent as well.

12       And during January and February of 2015, he consulted with

13  another employee of the United States Secret Service, both

14  before and after that employee was interviewed by agents for

15  the Department of Homeland Security Office of Inspector General

16  and the FBI.  And that the Defendant agreed with the other

17  witness to tell a false consistent story regarding the searches

18  conducted on a database controlled by the Financial Crimes

19  Enforcement Network, or FinCEN.

20       Finally, Your Honor, on March 30, 2015, in the Northern

21  District of California, the Defendant also misrepresented

22  certain facts to agents with the FBI and the Internal Revenue

23  Service criminal investigations with respect to the full scope

24  of the FinCEN database searches.  And these acts, Your Honor,

25  obstructed the investigation of the San Francisco-based grand

1   jury.

2       Those are the facts agreed upon by the parties' plea

3   agreement, Your Honor.

4           THE COURT:  Mr. Bridges, I know that was a long

5   recitation of facts.  I'm going to go over them with you.

6       But, let me begin by just asking you the question:  You've

7   heard the prosecutor review all those facts, correct?

8           THE DEFENDANT:  I have, sir.

9           THE COURT:  And do you -- and are they correct?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  All right.

12          MR. LEVIN:  Your Honor, if I may, I may have misheard

13  Mr. Evans.

14          THE COURT:  Yes.

15          MR. LEVIN:  It's quite possible.  But I thought early

16  on had said a date of October, 2013 as opposed to January 27,

17  2013, when some event happened.

18          THE COURT:  This is the reference to the lulling of

19  the manager of Silk Road?

20          MR. LEVIN:  (Nods head)

21          THE COURT:  I'm going to go over all those facts now,

22  so hopefully that will be clarified, if there was a date

23  misstatement.

24       So I'm not going to go over every single fact but I'm

25  going to go over several of these, Mr. Bridges.

1      Is it correct that on or about January 25th of 2013, you

2 devised a scheme to defraud and to obtain money and property

3 through false and fictitious representations?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Is it correct that you utilized an

6 administrator account on the Silk Web website -- Silk Road

7 website, belonging to another individual and not intended for

8 you, for your personal use, to obtain access to that site?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  All right.  And are you aware -- and you

11 are aware, is it correct, in that you agree that the government

12 could prove that Silk Road was a website where illegal goods

13 were posted for sale, including narcotics, and that payments

14 were accepted on this site in Bitcoin?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  Is it correct that you used the

17 administrator account to reset passwords for vendor accounts

18 and other accounts to give you access to those accounts and any

19 Bitcoin indie accounts?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Is it correct that you moved a total of

22 approximately 20,000 Bitcoin from various Silk Road vendor

23 accounts into a wallet over which you exercised control?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  Is it correct that the value at that time

```
 1   of the Bitcoin that was stolen was approximately $350,000?

 2              THE DEFENDANT:  Yes, sir.

 3              THE COURT:  Is it correct that on or about January 26

 4   of 2013, you moved the Bitcoin into an account at Mt. Gox, a

 5   digital currency exchange based in Japan?

 6              THE DEFENDANT:  Yes, sir.

 7              THE COURT:  Is it correct that on or about

 8   January 27, 2013, you attempted to lull the manager of the Silk

 9   Road site, Ross William Ulbricht, also known as Dead Pirate

10   Roberts (sic), also known as DPR, by telling him that you, too,

11   had had Bitcoin stolen from you?

12              THE DEFENDANT:  Yes, sir.

13              THE COURT:  And that this communication took place by

14   way of interstate wire; is that correct?

15              THE DEFENDANT:  Yes, sir.

16              THE COURT:  And is it correct that the government --

17   as far as you are concerned, the government could prove that

18   Ulbricht was in the Northern District of California on that

19   date when you were in Maryland?

20              THE DEFENDANT:  Yes, sir.

21              THE COURT:  Is it correct that between March and May

22   of 2013, you converted the Bitcoin into U.S. currency and

23   caused wire transfers of money totaling approximately $820,000

24   from the account at Mt. Gox into Quantum International

25   Investments LLC, an account you controlled as Fidelity?
```

```
 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  Is it correct that on June 2nd of 2014,

 3    you transferred funds from that Quantum Fidelity account into

 4    an account in the joint names of yourself and a person known to

 5    the parties?

 6              THE DEFENDANT:  Yes, sir.

 7              THE COURT:  And specifically, I'd like to ask you to

 8    look at Page 4 of the plea agreement.  And that page has a

 9    chart at the top which lists various financial transactions

10    with the dates and amounts listed.

11         Is it correct that the funds that are listed on this page

12    in this chart in each of those transactions were proceeds of

13    wire fraud?  Is that correct?

14              THE DEFENDANT:  Yes, sir.

15              THE COURT:  Is it correct that you carried out each

16    of those transactions with the intent to promote ongoing wire

17    fraud -- a wire fraud scheme and also to conceal and disguise

18    the nature, location, source and ownership, as well as the

19    origin of these illegal proceeds?

20              THE DEFENDANT:  Yes, sir.

21              THE COURT:  Now, during the time that you devised and

22    carried out the fraud and money laundering scheme, is it

23    correct that you were a Special Agent with the United States

24    Secret Service, and a member of the Electronic Crimes Task

25    Force, as well as the Baltimore Silk Road Task Force?
```

1        Is that correct?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  And was that task force at that time

4    engaged in investigating Silk Road, its vendors and buyers, and

5    also Dead Pirate Roberts, for which there was an ongoing grand

6    jury investigation in the District of Maryland?

7        Is that correct?

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  Okay.  And you agree that the Baltimore

10   Silk Road grand jury investigation was an official proceeding?

11             THE DEFENDANT:  Yes, sir.

12             THE COURT:  Is it also correct that the activities

13   you engaged in obstructed, influenced and impeded the Baltimore

14   grand jury related to its Silk Road investigation, as well as

15   its resulting case in the District of Maryland against Ulbricht

16   amongst others?  Is that correct?

17             THE DEFENDANT:  That's correct, sir.

18             THE COURT:  And in particular, that activity operated

19   to obstruct and impede the ability of the investigation to

20   fully utilize a cooperator's access to Silk Road after the

21   fraud, and caused the task force and the grand jury to spend

22   time and effort to investigate the thefts from Silk Road that

23   you had committed, and created additional incentive for

24   Ulbricht to attempt to hire someone to kill a cooperator who

25   Ulbricht suspected of committing thefts that you in fact had

1  committed?  Is that right?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  And it also had the effect, is it

4  correct, of obstructing, influencing and impeding the grand

5  jury investigation into Ulbricht in the District of Maryland?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  And is it correct that you agree that you

8  acted corruptly in obstructing, influencing, and impeding the

9  grand jury's Silk Road investigation?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Is it correct that by May of 2014, there

12  was also an active San Francisco-based grand jury investigation

13  into potential misconduct by Drug Enforcement Administration

14  Special Agent Carl M. Force, IV?  Is that correct?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  And that the San Francisco grand jury

17  subsequently began to investigate your conduct?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  And you also agree that the San Francisco

20  grand jury investigation was, like the one in Maryland, an

21  official proceeding?

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  Is it correct that on or about May 28 of

24  2014, you were interviewed by a Special Agent with the Bureau

25  -- Federal Bureau of Investigation, and that you intentionally

1  misled that agent?

2         THE DEFENDANT:  Yes, sir.

3         THE COURT:  Is it correct that on November 13 of

4  2014, you were interviewed by a Special Agent from the

5  Department of Justice Office Inspector General, and that you

6  intentionally misled that agent as well?

7         THE DEFENDANT:  Yes, sir.

8         THE COURT:  During January and February of 2015, is

9  it correct that you consulted with another employee of the

10  United States Secret Service both before and after that

11  employee had an interview on the subject of the investigation

12  with Special Agents from the Department of Homeland Security

13  Office of Inspector General and the FBI?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  Is it correct you met with that employee,

16  before and after the employee's interview --

17      (Reporter interruption)

18         THE COURT:  Oh, okay.

19      Is it correct that you met with the employee before and

20  after that employee's interview, and discussed the subject of

21  the interview, and agreed to tell a false consistent story

22  regarding searches conducted on a database controlled by the

23  Financial Crimes Enforcement Network, FinCEN?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  Is it correct that on March 30 of 2015,

1   in the Northern District of California, you misrepresented

2   certain facts to agents with the FBI and the Internal Revenue

3   Service criminal investigations with respect to the full scope

4   of the FinCEN database searches?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  And is it correct that you agree that

7   each of the interviews and actions described that we have just

8   reviewed were in connection with the San Francisco grand jury

9   investigation?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  And you further agree that by corruptly

12   engaging another Secret Service agent to tell a false story to

13   federal agents and by lying to federal agents, you obstructed,

14   influenced and impeded a San Francisco-based grand jury

15   investigation into your criminal conduct and that of former DEA

16   Special Agent Carl M. Force, IV?

17          MR. LEVIN:  Your Honor, if I may?

18          THE COURT:  Yes.

19          MR. LEVIN:  Again, I may have misheard Your Honor.  I

20   believe it's a Secret Service employee, to the extent

21   Your Honor said "Secret Service agent."

22          THE COURT:  All right.

23          MR. LEVIN:  We would only correct that aspect.

24          THE COURT:  Let me go over that again.  Is it correct

25   that you -- you further agree that by corruptly encouraging

1   another Secret Service employee to tell a false story to

2   federal agents and by lying to federal agents yourself, that

3   had the effect of obstructing, influencing and impeding the

4   San Francisco-based grand jury investigation into your conduct,

5   and that of former DEA Special Agent Carl M. Force, IV?

6          **THE DEFENDANT:**  Yes, sir.

7          **THE COURT:**  Very well.  With respect to the charge in

8   the criminal information, Count 1, which charges you with a

9   violation of Title 18 United States Code Section 1957, money

10  laundering, how do you plead, Mr. Bridges?  Guilty or not

11  guilty?

12         **THE DEFENDANT:**  Guilty.

13         **THE COURT:**  With respect to Count 2 in the criminal

14  information that charges you with a violation of Title 18

15  United States Code Section 1512(c)(2), obstruction of justice,

16  how do you plead?  Guilty or not guilty?

17         **THE DEFENDANT:**  Guilty.

18         **THE COURT:**  I find that Mr. Bridges has made a

19  knowing, intelligent and voluntary waiver of his Constitutional

20  rights and entry of the guilty plea; that there is an

21  independent factual basis for each of the elements of each of

22  the charges; and that he is therefore adjudged guilty of a

23  violation of Title 18, United States Code Section 1957, money

24  laundering, and Title 18, United States Code

25  Section 1512(c)(2), obstruction of justice.

```
1        I will refer the matter to U.S. Probation Office for

2   preparation of a presentence report.

3        Sentencing date?

4        MS. HAUN:  Is it about 70 days?  Or is it --

5        THE CLERK:  December 8th.

6        MS. HAUN:  December 8th.

7        THE CLERK:  Yes.

8        MR. EVANS:  What day is that?

9        THE CLERK:  Tuesday.

10       MS. HAUN:  Your Honor, could we request a special

11   setting in the afternoon?  I know Mr. Frentzen is in trial at

12   that time, and he would he like to be here as well.  And I know

13   that likely Mr. Levin and Mr. Denney will be flying from out of

14   town.

15       THE COURT:  Yes.

16    (Off-the-Record discussion between Defendant and Counsel)

17       MR. LEVIN:  I'm sorry; what was the date?

18    (Off-the-Record discussion between counsel)

19       THE COURT:  Well, if it's going to be specially set,

20   it doesn't have to be on Tuesday.  I'm flexible, if there's a

21   particular date someone wants to request.  I know there is

22   travel involved, and I can certainly accommodate you.

23       MR. LEVIN:  Thank you, Your Honor.  In light of the

24   travel that's involved, Monday would work better.

25       THE COURT:  Monday is fine.
```

```
 1          MS. HAUN:  The 7th?

 2          THE COURT:  Yes.  I think.

 3          THE CLERK:  Looks like --

 4          THE COURT:  Yes, I'm here.  That's the week before

 5   I'm gone.  All right.  So the 7th at -- what's -- I'm flexible

 6   on that date.  What time?

 7          MS. HAUN:  Could we set it for 3:00 p.m., Your Honor?

 8          THE COURT:  Yes.  3:00 p.m.

 9      (Off-the-Record discussion between counsel)

10          MR. LEVIN:  I'm sorry, Your Honor.

11          THE COURT:  Okay.

12      (Off-the-Record discussion between counsel)

13          MS. HAUN:  Okay Your Honor.  For now we would like to

14   set it for 3:00 p.m., and then it might be that we file a

15   stipulation to adjust not the date, but the time.

16          THE COURT:  That's fine.  I think I'm fairly

17   flexible.  The only thing would be if there is a trial going on

18   in the morning.  And I don't think there is on that date, so I

19   can adjust it accordingly.

20          MS. HAUN:  Thank Your Honor.  The government would

21   like to raise one more thing with the Court.

22          THE COURT:  All right.

23          MS. HAUN:  Your Honor, under the remand statute, 18

24   United States Code Section 3143(a), detention in this case, a

25   remand is not mandatory.
```

1       However, the statute reads that the Court shall order the

2   detention unless the Court finds -- you, the Judge -- that

3   there is clear and convincing evidence that the person is not

4   likely -- the Defendant is not likely to flee or pose a danger.

5   And so it's on the Court to make that determination.

6       And just today, Your Honor, we had some information come

7   to us that is concerning to the government, and we wanted to

8   raise it with the Court.  And unfortunately, we just got this

9   information today.  We have been exploring it this afternoon.

10      And that is that it's come -- and Pretrial Services we

11  have also just conferred with, and they had no knowledge of

12  this, either.

13      And the information is that the Defendant has been

14  actively trying to change his name and Social Security number

15  in the state of Maryland.  Since the -- since the time that he

16  executed his plea agreement.

17      And that's very concerning to the government, Your Honor.

18  And we wanted to bring that to the Court's attention.

19          **THE COURT:**  Mr. Levin?

20          **MR. LEVIN:**  Thank you, Your Honor.

21      It's my understanding that during his service as a Secret

22  Service agent, Mr. Bridges' identity was compromised on a few

23  occasions.  And then this summer he received a letter from the

24  Office of Personnel Management indicating that -- I believe

25  several of us received that letter that either work or worked

```
1   for the government -- indicating that there was hacking

2   involved, and people's personal information was jeopardized.

3       In light of -- it was only after that letter, in light of

4   that letter and all the other times his identity has been

5   compromised that Mr. Bridges, I believe it was on -- well,

6   petitioned the court that --

7           THE DEFENDANT:  Correct.

8           MR. LEVIN:  He petitioned the court, so it's a matter

9   of public record, for a name change.  Keeping the first name,

10  and taking -- petitioning the court to take a family member's

11  last name, is my understanding.

12          THE DEFENDANT:  I petitioned the court to take my

13  wife's name.

14          MS. HAUN:  Your Honor, actually, the government has

15  some additional information.  First of all, the last name, the

16  wife's last name -- which, he married the wife during the

17  pendency of this case, as the Court probably knows.  But the

18  first name was nothing remotely resembling anything having to

19  do with the wife.  It was a very odd name.

20      Also, although the Defendant is now saying that it was all

21  public record, he actually made several motions to seal or

22  limit inspection of the case record.

23      I think the most concerning thing here for the

24  government's perspective is that he failed to notify his

25  pretrial services officer, either here or in Maryland.  And to
```

1  say the least, they were very surprised to learn this

2  information today.  And it's concerning, because obviously, one

3  can procure travel documents in other names.

4     Also, the change of the -- the petition for the change of

5  Social Security numbers.

6     But at the time of Mr. Bridges, when he presented himself

7  to the Court on these charges back in March, it was discovered

8  that he had no fewer than four weapons in his possession, one

9  of which was an assault weapon.  The government is of the view

10  that that was an illegally-possessed weapon.  And those have

11  been now accounted for, and are in the custody of the FBI.

12     However, it is concerning the Defendant is trying to

13  change his name to something that is completely different.

14  It's not a name change that has, like I said, any resemblance

15  to just his wife's name or his own name.

16     **MR. LEVIN:**  Your Honor, as I was in the process of

17  relating the facts to the Court, in fact Mr. Bridges

18  volunteered on the day he came out to California for his

19  initial appearance that he had firearms in his home.  He

20  volunteered that information.  It wasn't brought out that he

21  had them.  He had them.  He volunteered it, and he voluntarily

22  turned them over.  I believe they are in the hands of law

23  enforcement.  And they were transferred within days of the

24  initial appearance.  If my memory serves me correctly.

25     That's a separate issue.  He was released.  At the time --

1    at the time of the initial appearance, and at the time of

2    Mr. Bridges' release, the government was aware of the presence

3    of firearms.  So that really has no part in today's analysis.

4         With respect to the name change, once -- it was

5    Mr. Bridges' intention to notify Pretrial once the petition had

6    been granted.  It was pending.  And whether he was right or

7    wrong in thinking Pretrial only wanted to know once it was

8    changed, that is when he intended to disclose it to Pretrial.

9         But the fact of the matter remains, Your Honor,

10   Mr. Bridges has been fully compliant with all the terms and

11   conditions of his pretrial release.  He has -- and I think the

12   pretrial officer can certainly tell the Court that he has been

13   going to alcohol abuse counseling, even more than what was

14   required.  And he has been compliant with that.  He's come to

15   the court hearings.  He's pled guilty.  He's done everything

16   that one would expect one might --

17            **THE COURT:**  He's currently located in Maryland; he is

18   being supervised in Maryland?  Is that right?

19            **MS. HAUN:**  Correct, Your Honor.

20            **MR. EVANS:**  Correct.

21            **THE COURT:**  Okay.  Explain for me again, I'm not sure

22   I understand this reason that you've articulated, Mr. Levin,

23   for why he's changed his identity.

24         I mean, okay, there was a hacking incident.  And those of

25   us who work for the Federal Government have had to deal with

1   that.  I'm not clear on why that's leading him to change his

2   identity or seek to change it.

3          MR. LEVIN:  Well, this was not the first time that

4   Mr. Bridges' identity had been compromised.  But it had

5   happened a few times during the course of his employment with

6   Secret Service.  And he just decided that he should change his

7   name.  And the Social Security number that he applied for is

8   linked to his old Social Security number.  So...

9          THE COURT:  You understand that the government's

10  concerned.  I mean, when we're concerned with looking at flight

11  risk, activity of this kind sends up a lot of red flags that

12  even if it had nothing to do with it, I -- I am not surprised

13  that they are bringing this to my attention, is the bottom

14  line.  Because if it's -- if it was carried forward, it would

15  perhaps provide an opportunity to utilize that new identity to

16  go elsewhere.  So it is a cause of considerable concern.

17      And so I suppose my question to you is:  What's going to

18  alleviate that concern for me?  I mean, give me a reason why I

19  shouldn't be quite distressed by this, and agree with the

20  government that it's -- we -- it's enough of a red flag that

21  I've got to do something about it.

22          THE DEFENDANT:  Could I speak directly to the Court,

23  Your Honor?

24          THE COURT:  Why don't you talk to your counsel about

25  how to answer the question.

1        (Off-the-Record discussion between Defendant and Counsel)

2            **MR. LEVIN:**   Your Honor, having consulted with

3    Mr. Bridges, it's my understanding Mr. Bridges consulted an

4    attorney prior to filing the documents.  And his -- his

5    attorney's counsel is what guided him to file the documents

6    that he filed.

7            **THE COURT:**   We don't know how -- what else he told

8    the attorney about his situation.  But I -- I suppose I don't

9    want to get -- I mean, that simply gives me some facts as to

10   what he was doing.  I -- I still find it curious why this is

11   going on at this time.

12       Let me now ask the government a question:  Were I inclined

13   not to require remand at this time, are there some additional

14   conditions that you think would be appropriate, such as there

15   will be no -- any effort at identity adjustment is to be

16   curtailed, and something, you know, along those lines?

17       I mean -- go ahead.

18           **MS. HAUN:**   Yes, Your Honor.  Not curtailed, but

19   absolutely forbidden.

20           **THE COURT:**   "Forbidden" is another way to say it,

21   yes.

22           **MS. HAUN:**   Just a couple things.  The reason I

23   mention the weapons is not because I'm proposing the danger to

24   the community.  I'm proposing that if he's procuring a new

25   identity, if he had been successful in that, that raises the

1  possibility he could go out under this new identity and procure

2  weapons, for example.

3          THE COURT:  (Inaudible)

4          MS. HAUN:  But really, the government's concern is he

5  didn't just petition for the name change once.  Our

6  understanding from the Circuit Court of Maryland -- and again,

7  I apologize for raising this today.  This information literally

8  came to us this morning, and we wanted to run down and make

9  sure that we were gathering the documents.  Had we known about

10  this before, from the Defendant, we certainly would have raised

11  this issue with -- through Counsel.

12      But I think that we understand from the Circuit Court of

13  Maryland that several name-change petitions filed by

14  Mr. Bridges were denied, and that this is the third, according

15  to the information we've received from them today.  So we have

16  the docket printed out, but we haven't been able to verify

17  three.

18          THE COURT:  Okay.

19          MS. HAUN:  But we would -- so on that basis, we would

20  seek remand.  If the Court is not inclined to remand the

21  Defendant today, then we would seek some additional conditions.

22      I know that Pretrial Services is here, and they have

23  proposed possibly a curfew.  Some electronic monitoring.  So, I

24  think that some of those conditions.  But as Your Honor said,

25  absolutely no attempts to change his identity.

1      THE COURT:  Right.  Let me follow up on your

2  question, on your point you just made with Mr. Levin.  Have

3  there been numerous efforts to change identity?

4      MR. LEVIN:  My understanding, Your Honor, is that

5  Mr. Bridges failed to check certain blocks, such as he did not

6  check the block that asked whether or not he had ever been

7  convicted of a sex offense, or a child -- child --

8      THE DEFENDANT:  If I was a convicted sexual offender.

9  So the court automatically denied, and I had to resubmit.  So

10  it's all on the same case.  It's not an additional case.

11      THE COURT:  Well, so let me confirm with you.  It's

12  not -- there weren't different names and different identities

13  and it would be denied and you tried a different one.  It was

14  all a part of one application process where denials were

15  occurring and revised forms were resubmitted?  Is that your

16  understanding?

17      MR. LEVIN:  That's my understanding, Your Honor.

18      (Off-the-Record discussion between Defendant and Counsel)

19      THE COURT:  Okay.  Our Pretrial Service officer, you

20  didn't come in from Maryland; you're here.  Right?

21      PRETRIAL SERVICES OFFICER WILSON:  That's correct.

22  Brad Wilson, U.S. Pretrial Services, San Francisco office.

23      THE COURT:  Right.  Ms. Haun mentioned some

24  additional conditions, and I certainly think a condition would

25  be that the -- that Mr. Bridges would -- is forbidden from

1  making any effort to change either his name or any personal

2  identifying information, including but not limited to Social

3  Security and the like.

4      What other conditions were you thinking of, with respect

5  to possibly electronic monitoring and --

6          **PRETRIAL SERVICES OFFICER WILSON:**  Your Honor, we

7  recommend that possibly the Defendant be placed on a location

8  monitoring with a curfew from 10:00 p.m. to 6:00 a.m. daily.

9          **THE COURT:**  Have you talked with your counterparts in

10  Maryland about just the feasibility of doing that?  I know

11  sometimes it depends upon the housing arrangement and all the

12  rest of it.

13          **PRETRIAL SERVICES OFFICER WILSON:**  Unfortunately, due

14  to the immediacy of the issue, I haven't had a chance.

15          **THE COURT:**  Right.  Okay.  Well, what I'm inclined to

16  do -- I do find this very troubling.  But I am prepared to at

17  this point accept the representation that this was, while not

18  what should have been done, not indicative of some effort to

19  begin a process of -- of fleeing.

20      So I am not going to remand the Defendant, but I am going

21  to add conditions.  And I think number one, forbidden,

22  absolutely forbidden from, and curtailing any ongoing efforts,

23  and not engaging in any further efforts to in any way change

24  identity or identifying information.

25      Is that understood, --

 1          THE DEFENDANT:  Yes, sir.

 2          THE COURT:  -- Mr. Bridges?

 3          THE DEFENDANT:  (Nods head)

 4          THE COURT:  No matter what reasoning you may have,

 5  you can't do it.  And number two, I'm going to adopt the

 6  electronic monitoring and the curfew suggestion.

 7          But implementing that, I'm not sure how we do that because

 8  Maryland is involved, and somebody has to talk to Maryland.

 9          So how do we go about -- it's been a while since I used to

10  put pretrial conditions in place, so I frankly don't remember

11  exactly how we do it.  What do you need from me to do it?

12          MS. HAUN:  Your Honor, I would propose that simply

13  the government come up with a proposed order that we submit to

14  you today.

15          THE COURT:  Okay.

16          MS. HAUN:  And that you issue an order --

17          THE COURT:  All right.

18          MS. HAUN:  -- directing these conditions.  The one

19  other condition I would like to revisit is -- and I'm not

20  asking for a new condition; I just want the Court to be aware

21  of a condition of pretrial release that Judge James back in

22  March -- or was it April 1st?  It was either March 30th or

23  April 1st, Judge James ordered a condition related to the

24  Defendant's use of the computer, and access to the computer.

25          And I wanted to make this Court aware of that, and so that

1   you could underscore that that condition still pertains.   And

2   if we could talk about that condition here today.   Because I

3   think, frankly, that should also -- that would make the

4   government feel better.

5           **THE COURT:**  All right.

6           **MS. HAUN:**  If the Court is not willing to remand the

7   Defendant, it would give the government some comfort to know

8   that the Defendant has curtailed ability to use the computer.

9           **THE COURT:**  All right.  Let's see if I have the

10   actual -- Judge James' actual order.  I'm not sure I have her

11   release conditions.  So, I don't have the particular language

12   that Judge James imposed.

13       But let me do this.  Mr. Bridges, one of the conditions of

14   your pretrial release, as I understand it, that were imposed by

15   Judge James was that you -- there were restrictions on your

16   computer use.

17       Was it a complete restriction or --

18           **MR. LEVIN:**  No, Your Honor.  I believe it had to do

19   prohibiting Mr. Bridges from accessing any encrypted sites.  I

20   believe that was the restriction that was placed.

21           **MS. HAUN:**  It was a little broader than that,

22   actually.  It was any kind of so-called -- and you know what,

23   Your Honor?  Since we're talking about this today, I frankly

24   find it a little vague.

25       I think in the proposed order, the government will work

```
 1   with Mr. Levin today to come up with some language.

 2            THE COURT:  All right.  Oh, here it is.  I actually

 3   have it.

 4            MS. HAUN:  It's deep web or dark net sites the

 5   Defendants is prohibited from accessing.  But I think the

 6   government would also propose he can't use any third party to

 7   access those sites on his behalf.  And I don't think that's a

 8   condition right now.  For example, his wife.

 9            THE COURT:  Well, I -- that doesn't sound -- that

10   sounds reasonable to me.  As long as it doesn't preclude any

11   third party from their own conduct.  Because we can't do that.

12            MS. HAUN:  (Nods head)

13            THE COURT:  But I'm looking at her release

14   conditions.  Frankly, I don't see anything on here that makes

15   reference to computer use.

16       It has the surrendering of the four firearms.  No access

17   to any proceeds of fraud, to include Bitcoin.

18       Okay.  Well, it says:

19            "No access to any proceeds of fraud to include

20            Bitcoin and to include Quantum, LLC or deep web

21            services such as 'TOB' network."

22       I don't know what that is.  I can't see it on here.  So if

23   you want to propose some computer restriction, I am prepared to

24   adopt it.

25            MS. HAUN:  (Nods head)
```

```
1              THE COURT:  So your suggestion is you are going to

2     get something to me.  Obviously, talk through it with

3     Mr. Levin, and hopefully you won't have a particular problem

4     with it.  But when are you going to present that to me?

5              MS. HAUN:  Your Honor, I think we could present that

6     by the close of business today, maybe give or take some time,

7     depending on how long our conversation with Mr. Levin goes.

8              THE COURT:  All right.

9              MS. HAUN:  But I'm hopeful we could get that to you

10    by today.

11             THE COURT:  What's the situation, Mr. Bridges --

12    when's he -- he's here.

13             MR. LEVIN:  Tomorrow morning, early flight, so that's

14    not an issue.  Thank you.

15             THE COURT:  All right.  Well, I will be here.  Craft

16    something.

17             MS. HAUN:  Some point tonight, Your Honor, I guess I

18    would say.

19             THE COURT:  Hopefully not tonight, but at some point,

20    promptly, I will have something in front of me to sign.  And

21    I'll do that.  And on that basis, I will maintain the release

22    conditions.

23         And just to underscore this discussion, Mr. Bridges, all

24    of the conditions that are already in place remain completely

25    in place.  So we're adding conditions.
```

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  So this is not a new set, in that sense.

3    And I want you to be quite aware of the fact that all the

4    existing conditions continue to apply.  And then we will be

5    discussing some additional ones.  Because you're proposing in a

6    supplemental order, as opposed to a refashioned order.

7          MS. HAUN:  Correct, Your Honor.  It would simply say

8    "All prior conditions pertain, and in addition, the following

9    additional conditions."

10         THE COURT:  All right.  Okay.  Well, I will be

11   looking for that.  And, see you then.

12         MS. HAUN:  Thank you, Your Honor.

13         MR. LEVIN:  Thank you, Your Honor.

14         THE COURT:  Thank you.

15         (Proceedings concluded)

16

17

18

19

20

21

22

23

24

25

1

2

3

4                          **CERTIFICATE OF REPORTER**

5        I, BELLE BALL, Official Reporter for the United States

6   Court, Northern District of California, hereby certify that the

7   foregoing is a correct transcript from the record of

8   proceedings in the above-entitled matter.

9

10        /s/   Belle Ball_____

11               Friday, April 1, 2016

12        Belle Ball, CSR 8785, CRR, RDR

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF FILING AND SERVICE

I certify that on August 5, 2016, I electronically filed the DEFENDANT-APPELLANT'S EXCERPTS OF RECORD VOLUME 1, PAGES 1-126 with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: August 5, 2016

_____
ISABEL HAAS